# United States Court of Appeals
## For the First Circuit

No.  22-1858

CARMEN QUINTANA-DIEPPA
Plaintiff – Appellant,

v.

DEPARTMENT OF THE ARMY
Defendant – Appellee

On Appeal from the United States District Court
For the District of Puerto Rico
Honorable Judge Aida M. Delgado-Colón
Civil Case No. 19-1277 (ADC)

**APPELLANT'S BRIEF**

**HUMBERTO COBO-ESTRELLA**, ESQ.
COBO ESTRELLA LAW OFFICE
*Counsel for Plaintiff-Appellant |Bar*1179880
PO BOX 366451
SAN JUAN, PUERTO RICO  00936-6451
Tel. (787) 529-7140 hcobo@hcounsel.com

**WINSTON VIDAL-GAMBARO**, ESQ.
Winston Vidal Law Office
*Counsel for Plaintiff-Appellant*
PO Box 193673
SAN JUAN, PUERTO RICO 00919-3673
Tel. (787) 751-2864 wvidal@prtc.net

**REQUEST FOR ORAL ARGUMENT**

The plaintiff-appellant respectfully requests oral argument for this case.

This appeal turns primarily on issues of federal employment discrimination law, which as this Honorable Court of Appeals has already recognized, is a complex and evolving area. See <u>Rodríguez-Machado v. Shinseki</u>, 700 F.3d 48, 49 (1st Cir. 2012) (*per curiam*). See <u>Medina-Rivera v. MVM, Inc</u>. No. 11-2419, pg. 7, ¶2.

Oral discussion of the case and disputed material facts may benefit the Court.

**TABLE OF CONTENTS**

*Page*

TABLE OF AUTHORITIES                                          4

JURISDICTIONAL STATEMENT                                     7

STATEMENT OF ISSUES                                          8

STATEMENT OF THE CASE/FACTS                                  9

PROCEEDINGS BELOW                                            9

STATEMENT OF FACTS                                          17

SUMMARY OF ARGUMENT                                         18

ARGUMENT                                                    29

    Issue One: Disputed Material Facts                    29

    Issue Two: Credibility of Witness Testimony            36

    Issue Three: Impermissible Inferences                  40

    Issue Four: Evidence Proffered by Plaintiff was Sufficient for a Jury    42

CONCLUSION                                                  43

CERTIFICATE OF COMPLIANCE                                   48

CERTIFICATE OF SERVICE                                      49

ADDENDUM                                                    50

# TABLE OF AUTHORITIES

***Page***

## I. CASE LAW:

*Adickes v. S.H. Kress and Co.*, 398 U.S. 144 (1970)  41

*Ahmed v. Johnson*, 752 F.3d 490, 502 (1st Cir. 2014)  10, 28

*American Cyanamid v. Capuano*, 381 F.3d 6, 21 (1st Cir. 2004)  41

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202

(1986)  15, 27, 29

*Biblioni del Valle v. Puerto Rico*, 661 F. Supp. 2d 155, 170 (D.P.R. 2009)  40

*Billings*, 515 F.3d at 55–56  40

*Burlington N. & S. F. R. Co. v. White*, 548 U.S. 52 (2006)  21, 23

*Burns v. Johnson*, 829 F. 3d 1 (1st Cir.2016)  10, 11, 26-28

*Caraballo-Carballo v. Correctional Administration*, 16-1597  21

*Celotex*, 477 U.S. 314  27

Chadwick, 561 F.3d at 48  11, 27, 28

*Cham v. Station Operators, Inc*., 685 F.3d 87, 94 (1st. Cir. 2012)  31, 41, 46

*Conward v. Cambridge Sch. Comm*., 171 F.3d 12, 20 (1st Cir. 1999)  21

*DeCaire*, 530 F.3d 1 at 20  40

*Díaz-Figueroa v. Ricoh P.R., Inc*., 661 F. Supp. 2d 140, 153 (D.P.R. 2009)  19

*Dominguez-Cruz v. Suttle Caribe, Inc*., 202 F.3d 424, 432 (1st Cir. 2000)  26

*Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992)   41

*Echevarria v. AstraZeneca*, LP, 133 F. Supp.3d 372, 402 (D.P.R. 2015)     23, 24

*Fantini v. Salem State Coll.*, 557 F 3d 22, 32 (1st. Cir. 2009)              22

*Febres v. Challenger Caribbean Corp.*, 214 F.3d 57, 61 (1st Cir. 2000)      25

*Fortier v. Ameritech Mobile Comm. Inc.* 161 F 3d 1106, 112 (7th Cir. 1998)  25

*Garcia Gonzalez v. Puig-Morales*, 761 F. 3d 81, 99 (1st Cir. 2014)          15, 26

*Harrington v. Aggregate Indus.–Ne. Region, Inc.*, 668 F.3d 25, 31 (1st Cir. 2012)

                                                                             24

*Hicks v. Baines*, 593 F.3d 159, 160 (2d Cir. 2010)                          25

*Hodgens*, 144 F. 3d. at 167                                                 18

*Hunt v. Cromartie*, 526 U.S. 541 (1999)                                     41, 42

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) 27

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–805 (1973)             19

*Medina-Rivera v. MVM, Inc.* No. 11-2419, pg. 7, ¶2                          31

*Morales-Vallellanes v. Potter*, 605 F.3d 27, 36 (1st Cir. 2010)             25

*Mulero-Rodriguez v. Ponte, Inc.*, 98 F. 3d 670, 677 (1st. Cir 1996)         18

*Mulvihill v. Top–Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir.2003)            27

*Patterson and Wilder Construction Co. Inc., v. U.S.*, 226 F. 3d 1269 (11th Cir.

2000)                                                                        42

*Pérez–Cordero*, 656 F.3d at 25                                              26, 27

*Rodríguez-Machado v. Shinseki*, 700 F.3d 48, 49 (1st Cir. 2012)          31

*Serrano-Cruz v. DFI Puerto Rico, Inc*., 109 F.3d 23, 25 (1st Cir.1997)          19

*St. Mary's Honor Center*, 509 U.S. at 511, 113 S.Ct. 2742          20, 25

*Straughn v. Delta Air Lines, Inc*., 250 F.3d 23, 35 (1st Cir. 2001)          10, 28

*Tang v. Citizens Bank*, 821 F.3d 2016 (1st Cir.2016)          28

*Velázquez-Fernández v. NCE Foods, Inc*., 476 F.3d at 11          19

*White v. New Hampshire Dept. of Corrections*, 221 F.3d 254, 259 (1st Cir. 2000)

          29

*Wyatt v. Boston*, 35 F.3d 13,15 (1st Cir. 1994)          25


**II. STATUTES:**

Age Discrimination in Employment Act, 29 U.S.C.A. §621et. seq.          18

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000 et seq.          22


**III. RULES:**

Rule 4(a)(1) of the Federal Rules of Appellate Procedure          7

Fed. R. Civ. P. 50          20

Fed. R. Civ. P. 56 (c)(3)          38

## I.  JURISDICTIONAL STATEMENT

We appeal the United States District Court for the District of Puerto Rico *Opinion* and *Order* (Dkt. #163) and *Judgment* (Dkt. #165) dismissing the plaintiff-appellant *Carmen Quintana-Dieppa's* (hereinafter "Carmen Dieppa") civil action against defendant-appellee *Department of the Army* (hereinafter "Army"). The District Court granted defense's motion for summary judgment dismissing Carmen Dieppa's federal civil employment discrimination claims, by issuing an *Order* and *Judgment* on September 30, 2022. Both the Order and Judgment were docketed by electronic filing system on *September 30, 2022*. See **Addendum A** /**Addendum B**

Pursuant to 28 U.S.C. §2107, the plaintiff-appellant filed a *Notice of Appeal* (Dkt. #168) on *October 26, 2022*. Notice of Entry which initiated the appeal period were notified through Notice of Electronic Filing/ Docket Activity. Pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, the Notice was filed within 30 days of Court's decision. This Court has jurisdiction pursuant to 28 U.S.C. §1291, because the District's decision is a final order or judgment that disposes of all of plaintiffs' claims in case no.**19-1277**. We'll demonstrate District Court's *Opinion* is profuse with multiple ***disputed facts***, ***issues of credibility of witness testimony***, and *impermissible* Court ***inferences of facts against*** **nonmoving party**, *Carmen Dieppa*. The appellant asks to **vacate** because the *findings of facts are **contrary** to evidence proffered* and the District Court should have submitted the case to a ***jury*** of *the facts*.

## II.    STATEMENT OF ISSUES

### ISSUE ONE:

Whether the District Court *erred* in granting summary judgment because it undertook a role of *fact finder* in the face of ***disputed material facts***. The District Court incorrectly assumed plaintiff's involuntary *reassignment* to a newly created non-supervisory position was a "transfer", *unsupported*

### ISSUE TWO:

Whether the District Court *erred* in granting summary judgment when the court *improperly assesses* the ***credibility of witness testimony***. The District Court incorrectly gave credibility to Carmen Dieppa's subordinates impeachable fabricated statements, used to justify the report

### ISSUE THREE:

Whether the District Court *erred* in granting summary judgment when it *failed* to make **all** material ***inferences*** in favor of ***nonmoving*** party. The District Court *assumed* the plaintiff wasn't a qualified Supervisor

### ISSUE FOUR:

Whether the District Court *erred* when it failed to acknowledge that the Plaintiff had proffered *sufficient evidence for a Jury* to determine plaintiff's *involuntary* reassignment in November 2017, was *adverse* and *retaliatory* and the District Court's findings of facts were contrary to evidence on the record. Carmen Dieppa proffered evidence she was qualified, defendant's witness version impeachable and reassignment *unsupported* by Second Investigation

### III.    STATEMENT OF THE CASE/FACTS

<u>PROCEEDINGS BELOW</u>

The case arises from Carmen Dieppa's claims related to *federal employment* workplace *Age Discrimination* and *Gender/Racial Discrimination*. Plaintiff Carmen Dieppa was subjected to a *hostile work environment* because of her *gender*, by her employer the Department of the Army, when she was selectively targeted by her employer for *involuntary reassignment*, because of her *age* and *gender*, as *retaliation* for having previously engaged in Protected Activity. The EEOC Order (Dkt. #94-2) entering Judgment for EEOC Charge No. 510-2015-00273X, where Carmen Dieppa alleged discrimination based on her *national origin*, was issued on July 27, 2017, notified to employer August 3, 2017. Shortly after, on November 17, 2017, Carmen Dieppa was *involuntarily reassigned* to a non-supervisory newly created position by her under protected age group male supervisors with a *pretextual* excuse, a punitive adverse action that evidenced a hostile work environment and constituted retaliation.

***Defendant-Appellee made decision to reassign her on January 25, 2017, while her EEOC case was pending***, despite Carmen Dieppa meting/exceeding her employer's objective performance expectations. Reassignment was *unsupported* by evaluations. (See **Add D**, Dkt. #80, pages 39-40, **Add F**) Joint Proposed Pretrial Order, Documentary Evidence for Plaintiff (Plaintiff's Performance Evaluations 2010-present) and (Defendant's Exhibit 5, January 25, 2017, Garrison Commander, COL

9

Michael Harvey's "Recommendation for Approval of Management Directed Reassignment") Reassignment was unsupported by a Second/Final AR investigation report about her "Leadership" Style which **did not recommend a reassignment**, recommendations were lenient. (See **Add E**, Dkt. #94-4, pages 3, 8) Simply put, the decision was not sustained by performance evaluations, and employer would NOT have removed from supervisory position, absent discriminatory/retaliatory reasons.

On summary judgment, a District court should credit plaintiffs' version of facts. See *Ahmed v. Johnson*, 752 F.3d 490, 502 (1st Cir. 2014) ("Determining which view more accurately reflects reality requires factfinding and credibility judgments that are properly the task of a jury."); *Straughn v. Delta Air Lines, Inc*., 250 F.3d 23, 35 (1st Cir. 2001) See *Burns v. Johnson*, 829 F. 3d 1 (1st Cir.2016).  It is not the role at summary judgment to assess witness credibility, and the Court cannot make inferences in favor of defendant, her employer. See *Ahmed,* 752 F.3d at 502; *Burns v. Johnson*, 829 F. 3d 1 (1st Cir.2016). However, this is what the District Court did, when it *assumed* Carmen Dieppa was "not qualified" for her job, and erroneously assumed she did not proffer performance evaluations. Findings by the District Court *unsupported* by the evidence. Can a supervisor not be qualified because subordinates say so when evidence on record shows employer's work evaluation say she *does*? Defendant never used work performance evaluations to support dispositive motion,

yet at Pre-Trial Hearing Carmen proffered and submitted her evidence to the Court, including work performance evaluations. (**Add D**, Dkt. #80, pag. 39 / Dkt. #108).



On record, a jury could find "a convincing mosaic of circumstantial evidence" shows discrimination did occurred. *Ahmed*, 752 F.3d at 497 (quoting *Holland v. Gee*, 677 F.3d 1047, 1056 (11th Cir. 2012)). As this Circuit Court of Appeals explained the District Court's role is only to assess that plaintiff has presented sufficient evidence of discrimination to have a day in court. *Chadwick*, 561 F.3d at 48; *Burns v. Johnson*, 829 F. 3d 1 (1st Cir.2016).

The District Court *erred* by making an impermissible inference in favor of moving party, as to how the Army managed to justify reassignment and by making credibility assessment as to statements made by individuals against her. By showing the second/final AR investigation report did not recommend her reassignment and her work performance evaluations showed she met/exceeded employer expectations, the District Court had an obligation to make factual inference *against* reassignment,

in favor of nonmoving party Carmen Dieppa. More so, after Carmen Dieppa put forth evidence that defendant's reason was a pretext, to cloak discriminatory animus.

First, in favor of vacating, we point out the District Court had *denied* (Dkt. #53) defendant's previous Motion for Summary Judgment (Dkt. #38). Note that Plaintiff had filed an Opposition (Dkt. #47) to Army's previous motion (Dkt. #38).

Second, dismissal of plaintiff's claims *after* a ***Joint Proposed Pretrial Order was filed on June 16, 2021 (Dkt. #80)***, and Pretrial Order was discussed *in court at length* during the **Final Pretrial Conference** held on June 28, 2021. (Dkt. #108), unjustly *prejudiced* plaintiff and unfairly deprived her of a day in court, specifically after **Trial Date** was scheduled on *two* occasions, and **vacated, in part, at behest of defense.** (Defendant's Motion at Dkt. #82) During Follow-up/Settlement Conference of January 1, 2021, **Jury Trial date was set for July 12-16, 2021** (Dkt. #65) And later during June 28, 2021, *Pre-Trial Conference* the District Court reset **Jury Trial Date for December 13-17, 2021**. On Nov. 28, 2021, defendant *again* filed another motion (Dkt. #137) to continue/vacate upcoming December Trial Date.

**At various times during proceedings the Court admonish *defense* counsel:**

(1)     "It is understood that **counsel for defendant has incurred in unnecessary technical approaches or stonewalling** which the undersigned expects are actions not to be undertaken from now on." Minute Entry, for proceedings before Hon. Judge Aida M. Delgado-Colon, Status Conference held 10/15/2021 (Dkt. #61); and

(2)     "The **Court is not satisfied with the way the case is being handled by counsel for defendant**. Counsel for the government has

been previously warned to avoid personal postures and adhere to court scheduling orders. More so, parties were instructed to seek informal resolution of minor disputes prior to escalating them to the Court. **Counsel for the government should exercise more caution in the way of characterizing opposing counsel's actions.** In opposing the third request for extension of time, plaintiff is not minimizing health issues of Counsel for the Army. **Actually, plaintiff was opposing a third request for extension when the Court had granted such opportunity twice and warned the government that no further extensions were to be granted. Counsel for plaintiff also pointed, albeit correctly, as to the absence of a notice of appearance by counsel for the Army.** This arguments, apparently have been misconstrued by counsel for the government. In requesting additional time to file a dispositive motion, Attorney Sevillano specifically alludes to his administrative duties as supervisor and reduced time to attend to the case. This matter constitutes an internal problem to be dealt by the USAO to the extent it may be in conflict with case schedule. In the other hand, it appears that Attorney Sevillano is relying in the legal counsel for the agency when such counsel has not even filed a notice of appearance. This is not procedurally correct and counsel for the government must know." Order, by Hon. Judge Aida M. Delgado-Colon, 06/21/2021 (Dkt. #85). (Emphasis)

District Court's Opinion fails to disclose actions taken with respect to defense counsel's conduct, yet it came short of branding undersigned counsel for the plaintiff as rogue-like. We respectfully disagree based on the following: (1) Defense in-house counsel for the Army Leslie Beuttell, did not file a required appearance (Dkt. #88) until we brought this to the attention of the Court (Dkt. #85), (2) Defense counsel attempted to stonewall by preventing the plaintiff from taking defense witnesses depositions (Dkt. #61), and (3) Defense counsel sought to vacate trial date on *two* occasions just weeks before Trial, claiming one unavailable witness (out of 26) (See Dkt. #65), a defense witness we showed was removed as result of an investigation,

based on publicly available information and not likely to cooperate. (Defendant's Motions at Dkt. #82 and #137) As result of the Court's admonishment, defense counsel Fidel Sevillano for USA was substituted by Lisa Bhatia-Gautier (Dkt. #86). Further, in our *Opposition* to New Trial Dates (Dkt. #84) we correctly pointed out defense failed to comply with L.Cv.R. 16(c)(5) by not including a statement of each defense witness testimony, as required, in the Pretrial Report (Dkt. #80).

Given the derogatory nature, possibly unjustified bias, and prejudicial effect District Court's comments (unnecessary for Summary Judgment) about plaintiff's counsel in its Opinion, may have on her case, we respectfully state our position. A jury could find supervisors retaliated by subjecting Carmen to *unjust scrutiny, fabricated allegations by subordinates* and involuntary reassignment to non-supervisory newly created position, *because* she opposed unlawful workplace practices and testified against employer. A fact-finding task best suited for a *Jury*.

Third, on July 30, 2021, Plaintiff submitted a comprehensive *Opposition* (Dkt. #110) with a *Statement of Contested Facts (Dkt. #110-1)* which included a *Statement of Additional Facts. (Dkt. #110-1, pg. 27)* Said documents put forth legal arguments against Army's Motion for Summary Judgment (Dkt. #93), identified statements put forth by defendant, which were *contested*. It also proffered, in a *separate* document defense witness *Damning Admissions.* (Dkt. #110-2) Filed with supporting exhibits:

14

**Document Selection Menu**

Select the document you wish to view.

| Document Number: ☑ | 110 | | 16 pages | 340.7 KB |
|---|---|---|---|---|

| Attachment | | Description | Pages | Size |
|---|---|---|---|---|
| ☑ | 1 | Exhibit Statement of Contested Facts | 31 pages | 280.7 KB |
| ☑ | 2 | Exhibit Defendant Damning Admissions | 5 pages | 162.4 KB |
| ☑ | 3 | Exhibit Plaintiff Dieppa Sworn Statement | 3 pages | 789.5 KB |
| ☑ | 4 | Exhibit Email sent to Carmen 2019 with Agency Decision | 2 pages | 81.4 KB |
| ☑ | 5 | Exhibit Supreme Court Decision on Title VII and EEO filing | 13 pages | 133.8 KB |
| ☑ | 6 | Exhibit Deposition Transcript Dan Carter | 26 pages | 450.8 KB |
| ☑ | 7 | Exhibit Deposition Transcript Tod Scalf | 32 pages | 628.5 KB |
| ☑ | 8 | Exhibit EEO Accepting Charge for Investigation | 5 pages | 4.4 MB |
| ☑ | 9 | Exhibit FEMA 4339 | 2 pages | 189.4 KB |
| ☑ | 10 | Exhibit Plaintiff Answer to Interrogatories | 19 pages | 263.5 KB |
| ☑ | 11 | Exhibit Plaintiff EEO Charge Documents | 19 pages | 661.3 KB |
| ☑ | 12 | Exhibit Gen Harvey Suspended News Report 1 | 9 pages | 1.6 MB |
| ☑ | 13 | Exhibit Gen Harvey Suspended News Report 2 | 16 pages | 3.5 MB |

| View Selected   or   Download Selected | 198 pages | 13.4 MB |
|---|---|---|

Carmen Dieppa asks to vacate, because *the findings of facts and conclusions of the District Court are contrary to evidence proffered. As we show in this Appeal* District Court took on the role of *factfinder* and gave *credibility* to the defense's witnesses, by way of *affidavits*, deviating from FRCP 56 Standard. However, **Courts cannot make credibility determination or weight the evidence**, **as these are jury functions and not of a Judge**. See *Anderson* 477 U.S. at 255; *Garcia Gonzalez v. Puig-Morales*, 761 F. 3d 81, 99 (1st Cir. 2014). (Emphasis) Contrary to the District Court's Opinion, Carmen Dieppa didn't rely solely on her own testimony, and the District Court abused its discretion because **the evidence proffered by her wasn't conjectural but based on the evidence already on the record which includes**

**defense witnesses' testimony taken during depositions, her former Supervisor Dallas Petersen's Sworn Statement, and her Work Performance Evaluations.**

Plaintiff submitted testimony/documents contradicting defendant's version of facts and viewing the record in light most *favorably for Carmen Dieppa*, with the benefit of all reasonable inferences flowing from evidence, a genuine factual dispute remains as to whether her involuntary reassignment on November 17, 2017, was discriminatory, and/or retaliation in response to her EEOC's Charge, given that the reassignment *decision was made while her Charge was pending* (January 2017) and involuntary reassignment carried out, shortly after EEOC's decision (August 2017).

Individuals who carried out Carmen Dieppa's involuntary reassignment, *not a recommendation* of the final report, defense witnesses Daniel Joseph Carter and Tod Antony Scalf, were both outside of Carmen Dieppa's protected groups. Both male, white, and under 40 years of age. Carmen Dieppa had worked longer (30yr+), was a female, Hispanic and over 40 years of age. They had just met in July 2017, with *Williams Leyh* to discuss Carmen's investigation, a RMO identified by Carmen on the EEOC Charge that was pending at the time reassignment decision was made.

Based on this and Carmen's outstanding performance evaluations, the District Court failed to consider *factual* inferences *in favor* of the plaintiff and incorrectly assumed total absence of genuine factual disputes, despite existence of legitimate issues of disputed material facts regarding her unlawful involuntary reassignment.

16

STATEMENT OF FACTS

Carmen Dieppa-Quintana is a female/Hispanic long-time federal employee. She is a civil employee of the United States Department of the Army, and has worked and *continues*, in the Commonwealth, at USAG-Fort Buchanan. She is sixty-two (62) years old and has worked for the defendant for over thirty (30) years. Defendant is vicariously liable for *Tod A. Scalf*, *Daniel J. Carter* and *Williams Leyh*, for discriminatory/retaliatory adverse employment actions taken against her, as alleged in her Complaint. (Dkt. #1) Carmen was involuntarily reassigned to a less desirable newly created non-supervisory position, a de facto demotion, from her supervisory senior leadership position (equivalent to a GS-12) as Child and Youth Services Coordinator NF-1701-04 on November 17, 2017. She was not afforded the required advance notice nor due process to oppose or appeal immediate adverse action. The action was punitive, and the letter issued contained derogatory information. Dieppa was not given the required 14-day advance notification, nor the right to a rebuttal, to oppose and/or appeal a fabricated investigation and subsequent reassignment. The report was *pretextual* and reassignment NOT supported by Second/Final AR report's recommendations. A pretext for age/gender discrimination and retaliation for her protected activity, including an EEO complaint she filed against *Williams Leyh* and *Former COL Caryn Heard* for racial discrimination (510-2015- 00273X). On November 17, 2017, she was asked to return office keys, go home and was placed

on administrative leave *involuntarily* directed by MWR Director Todd Scalf. **However, Plaintiff was never counseled by the defendant on any Supervisory issues, and Plaintiff's Performance Evaluations consistently demonstrated, as admitted by defense witnesses, she met or exceeded performance expectations.**

## IV.    SUMMARY OF ARGUMENT

Given the evidence submitted by plaintiff, her *Opposition* does not "*rest[] merely upon conclusory allegations, improbable inferences, and unsupported speculations*." *Hodgens*, 144 F. 3d. at 167 (quoting *Smith v. Stratus Computer, Inc*., 40 F. 3d 11, 12 (1ˢᵗ Cir. 1991)). Instead, plaintiff has set forth a plausible competing account of the proper inference to draw about what occurred at her workplace. A rational jury could draw an inference of discrimination and retaliation, but the Court should not supplant the role of the jury to weigh in competing inference. *Mulero-Rodriguez v. Ponte, Inc*., 98 F. 3d 670, 677 (1ˢᵗ. Cir 1996) "*Determination of motive and intent, particularly in discrimination cases, are questions better suited for the jury*" (quoting *Petitti v. New England Tel. Co.*, 09 F. 2d 28, 34 (1ˢᵗ. Cir. 1990)).

## ADEA

The Age Discrimination in Employment Act, as amended ("ADEA"), 29 U.S.C.A. §621et. seq. makes it illegal to discriminate against qualified persons at work because of their *age*. Plaintiff Dieppa was approximately sixty-one (61) years of age when subjected to age discrimination and had

**worked for defendant for approximately thirty (30) years, well qualified**. ADEA prohibits an employer from discriminating against individuals with respect to compensation, **terms, conditions, or privileges of employment**, because of age. 29 U.S.C. § 623(a)(1). (Emphasis) Carmen Dieppa can prove her case through McDonnell Douglas' burden shifting framework. See *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–805 (1973). Pursuant to this burden shifting framework, she can establish a prima facie case of age discrimination. Based on contested facts, she has put forth evidence that shows: (1) she was at least 40 years old; (2) met employer's job performance expectations (for over 30 years and had no history of any performance issues); (3) experienced adverse employment action (involuntary reassignment); and (4) employer had a continuing need for services provided previously by plaintiff. See <u>Velázquez-Fernández v. NCE Foods, Inc.</u>, 476 F.3d at 11. Assuming defendant articulates a legitimate, nondiscriminatory basis for its adverse employment action, plaintiff Dieppa can show that defendant's proffered reason is a mere ***pretext*** for the discrimination. See <u>Díaz-Figueroa v. Ricoh P.R., Inc.</u>, 661 F. Supp. 2d 140, 153 (D.P.R. 2009) (citing <u>González v. El Día, Inc.</u>, 304 F.3d 63, 70 (1st Cir. 2002)). ADEA makes it unlawful for employers to 'discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.'" *Serrano-Cruz v. DFI Puerto Rico, Inc.*, 109 F.3d 23, 25 (1st

Cir.1997) (quoting from text of the ADEA). "*[t]he plaintiff then has 'the full and fair opportunity to demonstrate,' through presentation of his own case and through examination of the defendant's witnesses, 'that the proffered reason was not the true reason for the employment decision,' . and that [age] was.*" *Id*. at 507-08, 113 S.Ct. 2742 (quoting *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089).    Although the plaintiff must then prove both that the defendant's explanation is *false*, and that the real reason behind defendant's actions was discriminatory *animus*, it will not always be necessary for the plaintiff to present additional evidence of discrimination beyond that necessary to prove that the proffered reasons are *pretextual*. As Supreme Court has explained, "*[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if the disbelief is accompanied by a suspicion of mendacity), may, together with the elements of the prima facie case, . permit the trier of fact to infer the ultimate fact of intentional discrimination.*" *St. Mary's Honor Center*, 509 U.S. at 511, 113 S.Ct. 2742 (emphasis added); see also *Kelley*, 140 F.3d at 349.    The reasonableness of the jury making such an inference, however, is subject to review under Fed. R. Civ. P. 50, just as any other finding of fact.

## Title VII

Defendant engaged in discrimination based on *gender* violating Title VII when Dieppa was treated *less favorably* than male counterparts and exposed to disparate disciplinary procedures: **Involuntary reassignment of *female***

**to non-supervisory (newly created) position after working for thirty (30) years**). Reassignment of this female was enforced by *Daniel Joseph Carter* and *Tod Anthony Scalf (*both *Males/UPAG)*, who selected Chico Medina (Male/UPAG) to replace her, but he humbly declined. NO females are involved in decision process. Prohibited retaliation is not limited to discriminatory actions affecting the terms and conditions of employment but can also include an action that "well might have **dissuaded a reasonable worker from making or supporting a charge** of discrimination." See *Burlington N. & S. F. R. Co. v. White*, 548 U.S. 52 (2006). (Emphasis) The Court should compare similarly situated individuals "in all relevant respects." See *Conward v. Cambridge Sch. Comm*., 171 F.3d 12, 20 (1st Cir. 1999); see also Ray v. Ropes & Gray LLP, 799 F.3d 99, 114 (1st Cir. 2015). "Reasonableness is the touchstone" of this inquiry. *Conward*, 171 F.3d at 20; see *Cumpiano*, 902 F.2d at 154 ("The issue of job qualifications must be viewed in an objectively reasonable way."). A Court then must decide "whether a prudent person, looking objectively" at the plaintiff and her comparator "would think them roughly equivalent," and similarly qualified for the position. *Vélez*, 585 F.3d at 451 (quoting Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 752 (1st Cir. 1996). See *Caraballo-Carballo v. Correctional Administration*, 16-1597, First Circuit Court of Appeals. No female was involved in the decision to reassigned Carmen, nor in the

selection process of Chico Medina to substitute her. Finally, her involuntary reassignment was NOT ever recommended by Second/Final AR investigation report.

## Retaliation

On September 19, 2014, plaintiff filed a harassment discrimination complaint **EEOC (Charge No. 510-2015-00273X)** alleging discrimination because of her national origin. Agency No. RD-2014-00799. ***Williams Leyh was aware she had complained about hostile work environment, specifically against him, yet Leyh got involved in the decision to reassign plaintiff by meeting with her supervisors in July 2017, to discuss this.*** A jury could find her supervisors retaliated by subjecting her to *unjust scrutiny, false allegations of misconduct* and involuntary reassignment to non-supervisory newly created position, *because* she opposed unlawful workplace practices and had testified against her employer. Defendants' conduct constitutes a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000 et seq. Title VII prohibits employers from discriminating against any employee on basis of her gender and prohibits retaliation against an employee who asserts rights under the law. 29 USCA §215 (a) (3). Protected conduct "refers to action taken to protest or oppose statutorily prohibited discrimination." <u>Fantini v. Salem State Coll.</u>, 557 F 3d 22, 32 (1st. Cir. 2009) (internal quotations omitted). It includes "the filing of formal charges of discrimination" as well as "informal protests of discriminatory employment

practices, including making complaints to management, writing critical letter to customers, protesting against discrimination by industry or by society in general, and expressing support for co-workers who have filed formal charges." *Id.* (quoting Sumner v. U.S. Postal Serv., 899 F. 2d 203, 209 (2nd Cir. 1990)). In the present case, plaintiff engaged in protected activity when *she complained about supervisors' discriminatory actions* because of race and was later subjected to a *fabricated* investigation, subsequently removed *from workplace with a pretextual excuse, involuntarily placed in a non-supervisory position, while unilaterally forced to take a leave.* Supervisors were aware thru *Williams Leyh* and *chose* to unlawfully exclude her from work, using a *pretextual* investigation. The Court will find that prohibited retaliation is not limited to *discriminatory actions* affecting the terms and conditions of employment but can also include an action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." See *Burlington N. & S. F. R. Co. v. White,* 548 U.S. 52 (2006).

To establish a prima facie case of retaliation, i.e., causality, "a plaintiff must engage in statutorily protected activity before an employer can retaliate against h[im] for engaging in that activity." Echevarria v. AstraZeneca, LP, 133 F.Supp.3d 372, 402 (D.P.R. 2015) (citing Serrano v. Donahue, No. CIV 12-1055 PAD, 2014 WL 4924434, *12 (D.P.R. Sept. 30, 2014) (citing Herron v. Daimler Chrysler Corp.,

388 F.3d 293, 303 (7th Cir. 2004) ("It is axiomatic that a plaintiff engage in statutorily protected activity before an employer can retaliate against her for engaging in statutorily protected activity.")). "There must be proof that the decision maker knew of the plaintiff's protected conduct when he or she decided to take the adverse employment action. One cannot have been motivated to retaliate 'by something he was unaware of.'" Echevarria, 133 F.Supp.3d at 402 (citing Pina v. Children's Place, 740 F.3d 785, 801 (1st Cir. 2014); Ameen v. Amphenol Printed Circuits, Inc., 777 F.3d 63, 72 (1st Cir. 2015) (quoting Medina–Rivera v. MVM, Inc., 713 F.3d 132, 139 (1st Cir. 2013))). **Here, the decision to reassign her was taken without any history of performance issues, nor Final AR investigation report including *any* reassignment as a recommendation.** A Jury can justifiably assume proffered reason was pretext to mask retaliation. See Harrington v. Aggregate Indus.–Ne. Region, Inc., 668 F.3d 25, 31 (1st Cir. 2012). To make *prima facie* showing of retaliation, the plaintiff must show that she engaged in protected conduct, suffered an adverse employment action, and that a causal nexus exists between the protected activity and the adverse action. *Gerald v. University of P.R.*, 707 F 3d 7, 24 (1st. Cir, 2013). **"Examples of adverse employment actions in the retaliation context include** termination of employment, a demotion evidenced by a decrease in wage or salary, **a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might**

24

be unique to a particular situation." **Morales-Vallellanes v. Potter, 605 F.3d 27,**

**36 (1st Cir. 2010)** (internal quotations omitted). See also *Fortier v. Ameritech*

*Mobile Comm. Inc.* 161 F 3d 1106, 112 (7th Cir. 1998) To prove a causal connection,

the employee may rely on direct evidence such as "[c]omments which, fairly read,

demonstrate that a decision maker made, or intended to make, employment

decisions based on forbidden criteria." Febres v. Challenger Caribbean Corp., 214

F.3d 57, 61 (1st Cir. 2000); see also Hicks v. Baines, 593 F.3d 159, 160 (2d Cir.

2010) (showing causal connection by evidence of retaliatory animus directed against

the plaintiff by the defendant). Courts have consistently held that defendant is liable

for retaliation against plaintiff for filing EEOC charge, regardless of validity or

reasonableness of charge. *Wyatt v. Boston*, 35 F.3d 13,15 (1st Cir. 1994).

### Pretext

It will not be necessary for a plaintiff to present additional evidence of discrimination

beyond that necessary to prove that the proffered reasons are *pretextual*. As the

Supreme Court has explained, "[t]he factfinder's disbelief of the reasons put forward

by the defendant (particularly if the disbelief is accompanied by a suspicion of

mendacity), may, together with the elements of the prima facie case, permit the trier

of fact to infer the ultimate fact of intentional discrimination." St. Mary's Honor

Center, 509 U.S. at 511, 113 S.Ct. 2742 (emphasis added); see also Kelley, 140 F.3d

at 349. At the summary judgment phase, however, "*courts should not unduly*

complicate matters . . . by applying legal rules which were devised to govern the basic allocation of burdens and order of proof." *Id.* (quoting *Mesnick v. General Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991)). Instead, the focus should be on "*whether, viewing the 'aggregate package of proof offered by the plaintiff' and taking all inferences in the plaintiff's favor, the plaintiff has raised a genuine issue of fact as to whether the [adverse employment action] was motivated by . . . discrimination*." *Id.* at 431. Such "weaknesses, implausibilities, inconsistencies, incoherencies, [and] contradictions in [Defendant's] proffered legitimate reasons" could lead a "reasonable factfinder" to find that the reasons are *pretext. Id.* See also *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 432 (1st Cir. 2000)

In the present case, there is a *causal connection* between the decision to reassign her from her supervisory position, and prior EEO case, because **when the decision was made by defendant (Jan. 2017), her EEO case was still pending** and had not yet been adjudicated (Aug. 2017) and reassigned was then enforced (Nov. 2017) shortly after. A fact-finding jury could determine action was *retaliatory*.

<u>Improper use of Summary Judgment</u>

The grant of summary judgment is subject to *de novo* review, with *all* reasonable inferences drawn in favor of *Carmen Dieppa* as the non-moving party. <u>Pérez–Cordero</u>, 656 F.3d at 25; <u>García–González v. Puig–Morales</u>, 761 F.3d 81, 86–87 (1st Cir. 2014); <u>Burns v. Johnson</u>, 829 F. 3d 1 (1st Cir.2016). He must "produc[e]

26

specific facts sufficient to deflect the swing of the summary judgment scythe."

Mulvihill v. Top–Flite Golf Co., 335 F.3d 15, 19 (1st Cir.2003). "An issue is

'genuine' if it can 'be resolved in favor of either party,' and a fact is 'material' if it

'has the potential of affecting the outcome of the case.'" Pérez–Cordero, 656 F.3d

at 25 (quoting Calero–Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir.2004));

Tang v. Citizens, 821 F.3d 206 (1st Cir.2016); Burns v. Johnson, 829 F. 3d 1 (1st

Cir.2016).  Once moving party establishes absence of genuine issues of material fact,

the burden then shifts to nonmoving party to set forth facts showing that a genuine

issue of disputed fact remains. Celotex, 477 U.S. 314 When ruling on a summary

judgment motion, the court must view all inferences drawn from the underlying facts

in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v.

Zenith Radio Corp., 475 U.S. 574, 587 (1986). At summary judgment, **"the judge's**

**function is not himself [or herself] to weigh the evidence and determine the**

**truth of the matter but to determine whether there is a genuine issue for trial**."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202

(1986). (Emphasis)

    This Circuit Court is asked to determine if Carmen Dieppa put forth *sufficient*

evidence from which a jury could decide adverse action "was more probably than

not caused by discrimination." Chadwick, 561 F.3d at 48. On summary judgment,

the district court should have credit plaintiffs' version of facts. See Ahmed v.

Johnson, 752 F.3d 490, 502 (1st Cir. 2014) ("Determining which view more accurately reflects reality requires factfinding and credibility judgments that are properly the task of a jury."); Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 35 (1st Cir. 2001) See Burns v. Johnson, 829 F. 3d 1 (1st Cir.2016).

*The District Court failed to correctly apply this framework*. There is sufficient *direct* (i.e., First AR Investigation recommending "transitioning Ms. Dieppa to retirement." (Dkt. #94-3, Recommendation 3, pag. 15) showing discriminatory animus and Performance Evaluations showing Carmen met/exceeded expectations (Dkt. #80, pag. 39) and was qualified) and *circumstantial* evidence (i.e., Supervisors Meeting with William Leyh in July 2017 to discuss Carmen's Investigation (Carmen filed earlier EEO Charge against William Leyh) (Dkt. #110-2, pages 3-4) and Sworn Statement by Dallas Petersen (Dkt. #130-1, pages 1, 3) indicating said investigation and subordinate statements collected were "fabricated" and "mostly bogus") *on record* from which a jury could conclude adverse action "was more probably than not caused by discrimination." Chadwick, 561 F.3d at 48; Burns v. Johnson, 829 F. 3d 1 (1st Cir.2016). Carmen Dieppa and the Department of the Army have divergent accounts of what happened at her workplace, and there is no question the court should have resolved all factual disputes in favor of Carmen Dieppa, the non-moving party. See Tang v. Citizens Bank, 821 F.3d 2016 (1st Cir.2016). "Credibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge…" See

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Evidence supporting a

verdict may be entirely circumstantial, and it need not exclude every hypothesis

contrary to the verdict; "that is, the fact-finder may decide among reasonable

interpretations of the evidence." See White v. New Hampshire Dept. of Corrections,

221 F.3d 254, 259 (1st Cir. 2000) (quoting United States v. Scharon, 187 F.3d 17,

20 (1st Cir.1999))

## V.     ARGUMENT

**ISSUE ONE: Whether the district court erred in granting summary judgment
because it undertook the role of fact finder
in the face of *disputed material facts*.**

The District Court incorrectly assumed plaintiff's involuntary *reassignment* to a
newly created non-supervisory position was a "transfer", *unsupported* by record

The District Court's Opinion erroneously frames plaintiff's claims in a way

to diminish the reason why Carmen Dieppa filed a Civil Action in the first place:

Court states that plaintiff's lawsuit supposedly stems from seven alleged incidents.

**Addendum A** *Opinion*, pag. 2 *However*, a look at her *Complaint* (Dkt. #1, pag. 1,

¶1) indicates a lawsuit in response to unlawful ***reassignment*** to a non-supervisory

position. In fact, the word "reassignment" appears *thirty-one (31)* times in her

Complaint, and Carmen referenced to her involuntary reassignment in paragraphs:

1, 2, 3, 4, 5, 8, 9, 18, 23, 44, 49, 50 and 52. Complaint's *Prayer of Relief*, *sec. B*

specifically asked District Court to *revert* her unlawful reassignment and order

defendant to reassign her back, and *sec. C* asked Court to order expunction of employment record, of derogatory information resulting from 15-6 investigations. (Dkt. #1, pag. 15) **At no point, ever, did Carmen Dieppa refer to "transferring" to another position, the words used by the Hon. District Judge. Addendum A**, Opinion, pag. 2, #5. Defendant's own SUF referred to a "Reassignment Letter". **From the start, there is a disputed material fact as to whether Carmen Dieppa underwent an involuntary "reassignment" or "transferring" as District Court improperly *assumes*.** This alone mandates the Opinion and Judgment be *vacated*, and this issue be submitted to a fact-finding *jury*, to determine if she was reassigned *or* transferred. In support, we point out that she was not "transferred" to an existing position, in fact, it was a newly created position as Project Manager, to which she was unjustly reassigned, after 30 years of civil federal employment, from a senior supervisory position. Black's Law Dictionary defines "transfer" as *"[t]o convey or remove from one place or one person to another; to pass or hand over from one another, esp. to change over the the possession or control to…"* Black's Law Dictionary, 11Th. Ed., Bryan A. Garner, Thomson Reuters, pag. 1803 The incorrectly used word refers to transfer of *property* from one person to another. A person, other than a slave, cannot be "transferred" like property, and much less into a position that does not exist. The District Court was obliged to make all favorable inferences for nonmoving party, Carmen Dieppa, and had to abstain from weighing the evidence,

and drawing legitimate inferences from facts, functions of a jury, yet it chooses to rephrase material facts such as the *reassignment* in way that was most convenient for moving party. **Add A** *Opinion*, pag. 2, #5 **This Honorable Court has recognized a *reassignment* with significant different responsibilities constitutes *adverse* action.** *Cham v. Station Operators, Inc*., 685 F.3d 87, 94 (1ˢᵗ· Cir. 2012)

The Court was aware that employment-discrimination law, as this Honorable Court of Appeals has recognized, is a complex and evolving area. See <u>Rodríguez-Machado v. Shinseki</u>, 700 F.3d 48, 49 (1st Cir. 2012) (*per curiam*). See <u>Medina-Rivera v. MVM, Inc</u>. No. 11-2419, pg. 7, ¶2, Yet it granted summary judgment in the face of disputed facts, by openly admitting "This only makes it harder for the Court to do its job" by inaccurately assuming "plaintiff's submitted exhibits are not property organized" **Add A** *Opinion*, Footnote 4, pag. 8. A closer look at the detailed list of exhibits filed with Carmen Dieppa's opposition, as illustrated here on pag. 15 and 43 show each had an *accurate description* in the document selection menu and were listed with corresponding titles in *table of exhibits* shown in Opposition's Statement of Contested Facts. (Dkt. #110-1, pag. 1) **If the District Court somehow felt it was not up to such a task, it should not have ruled in favor of defendant, and instead should have *submitted the case to a jury* trial.**

We very respectfully disagree with the District Court categorizing plaintiff's Opposition as having "fatal shortcomings" (**Add A**, Opinion, pag. 4) A close look

at plaintiff's *Opposing Statement of Contested Facts* (Dkt. #110-1) show *each* of the numbered paragraphs proposed by defendant as "uncontested facts", were either admitted or rebuked in a similar neatly corresponding number fashion. Most of the rebuked facts were supported by specific record citations. Out of a total of *ninety (90) statements* of uncontested facts proposed, only *six (6)* of Plaintiff's Opposing Statement of Facts (POSF 14, 46, 75,76, 80, and 90) did not include record citations. In sum, plaintiff responded to *over 90% of statements*, with *record citation*s, as required by the Rules. Therefore, erroneously categorizing plaintiff's Opposition as having "fatal shortcomings" seems prejudicial and demonstrates the case was not suitable for summary disposition, considering a Joint Pretrial Report was discussed.

The District Court impulsively concludes "All other oppositions refer to record citations that do not lend support to Quintana's proposition." When refereeing to POSF 8, 28, 29, 31, 33, 38, 47, 51, 57, 61, 62, 63, 67, and 85. **Add A** *Opinion*, pag. 5 However, **Opinion falls short of explaining how** *each* **of these do not**, when District only limits explanation to *one*, POSF 8. *Opinion*, pag. 6. But let's examine POSF 8, for sake of demonstrating to how the District Court *erred* in the face of disputed facts. The District Court *assumes* DSUM 8 states only that Carmen Dieppa Quintana "was the subject of an investigation". But that is NOT what DSUM 8 indicates, as it refers to "FMWR Supervisory chain" being the subject of the investigation, and three (3) individuals being identified, including two others: *Dallas*

*Petersen* and *Samuel McGuiness*. DSUM did not refer exclusively to Carmen but to all Supervisory Chain individuals, that also happens to include her. However, PSOF 8 *rebukes* that statement, because *at the time* of said investigation Carmen was unaware, she was *also* a subject of said investigation. Some Record citations given by Carmen, support her response, which includes Carmen Dieppa's own *Sworn Statemen*t, which states: (13) My removal from supervisor post was not one of the recommendations addressed on the 15-6 investigation report. The report did not ask for my removal, and defendant failed to follow the recommendations of the report, which were lenient. (Dkt. #110-3, pg. 3) The *AR-15 Investigation* referenced in Carmen's PSOF at Dkt. 110-1, on page 1, Exhibit list referenced to the AR-15 Investigation as Defendant's Exhibit 3, at Dkt. #94. A look at the AR-15 *purposes* (Dkt. #94, at pag. 16) indicated "(1) Purpose. *To obtain the CG's decision regarding the AR 15-6 investigations into allegations of misconduct and mismanagement by the supervisory chain within FMWR*, Fort Buchanan." No specific reference is made as to Carmen, nor any of the individuals subject of said investigation, as stated in defendant's SOUF as "individuals were identified". Finally, Carmen also made specific reference to defense witness *Daniel Joseph Carter deposition testimony*, in which he admits "…because when I was investigated, **it wasn't about her, it was about Dallas Peterson** questions" (Emphasis) See Defense witness *Daniel Joseph Carter Deposition Transcript*, Dkt. #110-6, pag. 25, lines 13-17. Further, the

investigation into Carmen was *not* mentioned in the memo Daniel Carter received, it came by "word of mouth" from Colonel Michael Harvey. He was never told why. *Daniel Joseph Carter Deposition Transcript*, Dkt. #110-6, pag. 26, lines 6-11. See also *Daniel Joseph Carter Deposition Transcript*, Dkt. #110-6, pag. 27, lines 6-14. Therefore, with Carmen's Sworn Statement, AR-15 Investigation and Dan Carter's Deposition, all citations included in response, Carmen Dieppa successfully *disputed* DSUM 8, and showed there was a genuine disputed fact as to whether *she* was *the* "subject" of that Second AR-15 investigation. A disputed fact fit for a jury.

District Court discussed only *one (1)* DSUM #8 and on page 6 of the *Opinion* quickly rushed to conclude, *without any discussion or analysis* of the multiple opposed or qualified statement of facts: DSUM 14, 28, 29, 31, 33, 37, 38, 39, 45, 47, 51, 54, 57, 60, 61, 62, 63, 67, 75, 76, 85, 89, and 90. (See *Opinion*, Dkt. #163, at pag. 5 and 6) **The lack of *any* discussion or analysis by the District Court as to why "Quintana fails to properly contest the Army's proposed uncontested material facts" of these DSUM, justifies vacating the Opinion and Judgment. It places plaintiff at a disadvantage: How can she appeal something the Court, which was mandated to show there were no disputed facts, *failed* to articulate?**

We respectfully disagree with the Court's ruling disregarding *all* statements of *additional facts*, set forth in Plaintiff's *Opposition* (Dkt. #110-1, pages 27-31), simply because, although in a separate section, were *unnumbered* and according to

the District Court this place an "undue burden upon the Army and the Court." See *Opinion*, at Dkt. #163, pag. 7. *First* we point out the *Motion for Summary Judgment* was filed on June 30, 2021, and *Opposition* on July 30, 2021. The District Court *Opinion* and *Judgment* were issued on September 30, 2022, therefore the District Court had *over a year* to thoroughly review each statement of facts. *Second*, plaintiff opposed defendant's *untimely* Motion to Strike Plaintiff's Statements of Facts (See *Opposition*, at Dkt. #135, pag. 2), where we call attention that defendant's motion was *untimely*, and the argument *waived* pursuant to Local Rule 7(b) which mandates that a party waives objections if no opposition filed within 14 days. Defendant failed to timely move to strike plaintiff's *Statements of Additional Facts* pursuant to Local Rule 7(b) and FRCP 12(f)(2) and failed to comply with FRCP 12(f) by not showing such statements met any of the criteria listed by the rule, giving Court authority to strike pleadings. Plaintiff filed Opposition to MSJ on July 30, 2021, and defendant waited *two months*, until October 12, 2021, to file an *untimely* motion to strike (Dkt. #132) *Third*, said *Statement of Additional Facts* were not only listed in a separate section in Opposing Statement of Contested Facts (Dkt. #110-1, pag. 27-31) but were attached in a *separate document* titled "Defendant Damning Admissions" (**Addendum G**, Dkt. #110-2) Finally, **FRCP 56(c)(3) mandates that any material not cited, and other material *in the record may* be considered by the Court. L.Cv.R. 56(e) clearly states that the Court may only disregard "…any**

**statement of fact not supported by a specific citation to record...”** In the present case, **ALL Statements of Additional Facts submitted had** *citations*. Therefore, District court abused its discretion, because it could *not* disregard these Additional Statements of Facts, **with citations**, because they were supposedly just *unnumbered*.

District Court also erroneously stated plaintiff failed to show discrimination, because supposedly Carmen Dieppa “could not point to evidence in the record” showing that “anybody” outside her protected group was promoted. Add A, *Opinion*, Dkt. #163, page. 22. This is *incorrect*. In responding to DSUF No. 40, plaintiff *did* point out that a male under her PAG was chosen by Supervisor Tod Antony Scalf to substitute her, *Chico Medina,* a male under her protected age group. In her Statement of Additional Facts, Plaintiff indicated that Roberto Chico Medina was interviewed by Tod Scalf to substitute Carmen. See *Tod Anthony Scalf, Deposition Transcript* pg. 50, lines 12-17, and Supervisor Tod Anthony Scalf *admitted* that Roberto Chico Medina, *was chosen* by him to replace Carmen, but declined to accept her position. *Tod Anthony Scalf, Deposition Transcript* pg. 54, lines 20-25; pg. 55, lines 1-8. See Statement of Contested Facts (Dkt. #110-1, pag. 27) See also Defendant Damning Admissions (**Addendum G**, Dkt. #110-2, pag. 2)

<u>**ISSUE TWO**</u>: **Whether the district court erred in granting summary judgment when the court improperly assessed the *credibility of witness testimony*.**

<u>The District Court incorrectly gave credibility to Carmen Dieppa’s subordinates impeachable fabricated statements, used to justify the report and her reassignment</u>

36

The District Court erroneously assumes plaintiff made no evidentiary showing that she met employer's legitimate job performance expectations. **Add A** *Opinion*, Dkt. #164, pag. 17. Instead, the District Court claims the Army "flooded the record" with material of "evidentiary value" However, a closer look at the DSUMF's used show they are based on inadmissible *hearsay* statements by her subordinates during a questionable pretextual *investigation* about her "leadership" style. **These are not her actual employer's performance evaluations and Defendant failed to support DSUMF with performance evaluations.** Here District Court improperly assessed the credibility of defense witnesses, which are *impeachable* during trial. Contrary to District Court remarks, Carmen Dieppa *did*: For example, in opposing DSUMF 51, with regards to her performance review, Carmen make several references:

> **When Dan Carter became Program Dir (2016), he was not aware of any problem with Dieppa**. *Daniel Joseph Carter, Deposition Transcript pg. 19, lines 14-18*

> Daniel Carter doesn't know of any performance standards issued for Carmen Dieppa. *Daniel Joseph Carter, Deposition Transcript pg. 43, lines 10-11 Daniel Joseph Carter, Deposition Transcript pg. 48, lines 6-8 Tod Anthony Scalf, Deposition Transcript pg. 77, line 11*

> No performance evaluation was given to Dieppa during 2017 prior to reassignment. *Tod Anthony Scalf, Deposition Transcript pg. 56, lines 16-19*

> **Supervisor Scalf did not give Dieppa written admonishments prior to reassignment**. *Tod Anthony Scalf, Deposition Transcript pg. 58, lines 9-15*

> **Supervisor Scalf never placed Carmen in a personal improvement plan, nor gave her any kind of written reprimand**.

*Tod Anthony Scalf, Deposition Transcript pg. 70, lines 17-22*
See Statement of Contested Facts at Dkt. #110, DSUMF 51, at pag. 16-17.

Defendant's own DSUMF #4 contradicts the Court's erroneous finding. In DSUMF #4 Carmen Dieppa admitted that in February 2016, she received a "salary increase for Outstanding performance" recommended by her supervisor Dallas Petersen and approved by Fort Buchannan Garrison leadership. *By its own Admission, defendant was aware Carmen Dieppa was not only meeting, but had an "Outstanding performance" warranting a salary increase.* See Statement of Contested Facts (Dkt. #110-1, No. 4, at pag. 2). Defendant didn't flood the record as indicated, to contrary.

Pursuant to FRCP 56 (c)(3) the District Court may consider other material in the record. In this case, shortly after filing her *Opposition*, plaintiff submitted: (1) Her *Performance Evaluations* with the Joint Pretrial Report (**Add** D Dkt. #80, pag. 30, Add F) and (2) the *Sworn Statement* of her witness/former supervisor *Dallas Petersen*, in which he stated that "Carmen always received the highest scores in the Army in these visits", that "none of which ever panned out as true" referring to unverifiable statements against Carmen, intended to "harass Carmen" and mostly "bogus". See plaintiff's witness/former supervisor Dallas Petersen *Sworn Statement*, at Dkt. #130-1, ¶4, ¶9 and ¶10. **Given the issue of credibility of witness testimony, as well as disputed facts as to whether she was meeting employer's objective expectations, this issue is fit for a jury, and Court's Opinion should be vacated**.

With respect to Carmen Dieppa's Title VII *retaliation* claim, she proffered circumstantial evidence. Plaintiff admitted (DSUC No. 3), with respect to having filed an EEOC Charge of discrimination in 2014, which included *William Leyh*. She qualified DSUC No. 37, with the supporting testimony of Daniel Joseph Carter to the fact that William Leyh did not approve her request for a promotion. See *Daniel Joseph Carter Deposition Transcript*, Dkt. #110-6 at pag. 52, lines 15-25. In her response to DSUC No. 72, Carmen Dieppa admitted William Leyh was a decision maker she believes discriminated against her. (Dkt. #110-1, pag. 24) *It was William Leyh who notified Daniel Carter and Tod Scalf (Carmen's newest supervisors) about the investigation related to Carmen.* (Dkt. #110-1, pag. 29) (See **Add G**, pag. 3) Supervisor Tod A. Scalf had a meeting with William Leyh at some point in July/August 2017 to discuss the AR15 investigation against Carmen Dieppa and was aware of pending EEOC case. See Tod Anthony Scalf, Deposition Transcript (Dkt. #110-7, pg. 82, lines 1-18) See also Dkt. #110-1, at pag. 30) (See **Add G**, pag. 3)

Contrary to Court's finding that Carmen supposedly did not supply "any" evidence of retaliatory animus (**Add A**, *Opinion*, Dkt. #163, at pag. 34) Carmen *showed* that *William Leyh*, an individual she named in her 2014 EEOC Charge, was involved in a meeting with her new supervisors in the summer of 2017, to discuss the AR-15 pretextual investigation. Based on circumstantial evidence, a fact-finding jury could find that *William Leyh* interaction with supervisors was the reason for her

reassignment, given that investigation report did not recommend that. Here Carmen Dieppa demonstrated based on direct *and* circumstantial evidence, her supervisors became aware of her protected activity through William Leyh, prior to reassignment.

A causal link may be *inferred* when retaliatory conduct happens soon after the protected activity. <u>Biblioni del Valle v. Puerto Rico</u>, 661 F. Supp. 2d 155, 170 (D.P.R. 2009). When adverse action occurs long after protected activity, or without direct evidence, employee may *still* prevail by presenting enough circumstantial evidence to *infer* there is a causal link between her activity and adverse action. See <u>DeCaire</u>, 530 F.3d 1 at 20. Circumstances surrounding the event used to take adverse action are sufficient to suggest *pretext*, "through 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence.' " <u>Billings</u>, 515 F.3d at 55–56 (quoting <u>Hodgens v. Gen. Dynamics Corp</u>., 144 F.3d 151, 168 (1st Cir.1998)).

### <u>ISSUE THREE</u>: Whether the district court erred in granting summary judgment when it failed to make *all* material *inferences* in favor of the plaintiff-appellant, the *nonmoving* party.

<u>The District Court improperly assumed plaintiff wasn't a qualified Supervisor</u>

As previously referred to in Issue One, the District Court incorrectly assumes plaintiff's reassignment was a *transfer*, and points out to DSUMF 31, 32 and 36, to reach said conclusion of fact. **Add A**, *Opinion*, Dkt. #163, pag. 17. However, NONE

of the DSUMF referred by District Court mention "transfer" each DSUMF referred, indicated "reassignment" and refers to a "letter of reassignment". (See Dkt. #94, Dkt. #110-1, pag. 9-10, 12) This Hon. Court recognized *reassignment* with significant different responsibilities constitutes *adverse* action. *Cham v. Station Operators, Inc*., 685 F.3d 87, 94 (1st. Cir. 2012) However, District Court improperly crafted its remark to diminish adverse employment action taken by defendant by categorizing *sua sponte* as "transfer" *without* ANY supporting evidence on record stating so. In doing so, the District Court failed to make all inferences in favor of the nonmoving party and made an inaccurate inference in favor of defendant.

When a district court's findings of fact are erroneous, they should be reversed if they are not supported by substantial evidence on record. See American Cyanamid v. Capuano, 381 F.3d 6, 21 (1st Cir. 2004). The District Court dismissal of Carmen Dieppa's claims is not supported by evidence on record, nor the lack of, but mostly on District Court's apparent belief that Carmen's reassignment was not adverse. Yet the evidence of non-moving party/appellant had to be believed as true, and all doubts resolved against moving party, and all evidence construed in light most favorable to non-movant, with all reasonable inferences to be drawn in *Carmen's favor*. See: Hunt v. Cromartie, 526 U.S. 541 (1999); Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451 (1992) and Adickes v. S.H. Kress and Co., 398 U.S. 144 (1970) So long as more than one inference can be drawn and the inference creates a

genuine issue of material facts, the trier of fact is entitled to decide which inference to be believed and summary judgment is *not* appropriate. <u>Hunt</u> at 541, 552; <u>Patterson and Wilder Construction Co. Inc., v. U.S.</u>, 226 F. 3d 1269 (11th Cir. 2000).

> **ISSUE FOUR:** Whether the District Court *erred* when it failed to acknowledge that the Plaintiff had proffered *sufficient evidence for a Jury* to determine plaintiff's *involuntary* reassignment in November 2017, was *adverse* and *retaliatory*.

<u>Carmen Dieppa proffered evidence she was qualified, defendant's witness version was impeachable, reassignment *unsupported* by Second Investigation results</u>

As previously referred to in Section III, the District Court incorrectly assumes plaintiff failed to proffer any evidence she was meeting employer's expectation. However, defendant never used work performance evaluations to support dispositive motion, and at Pre-Trial Carmen listed and proffered her evidence, which **included her work evaluations**. (**Add D**, Joint Proposed Pretrial Order Dkt. #80, pag.39. Contrary to the Opinion, Carmen Dieppa's Opposition contained a detailed list of Exhibits, they were *labeled* and *identified* in the Docket Report for Opposition (Dkt. #110). Below is a screenshot of a list included on pag. 1, Dkt #110-1 her *Opposition*.

**Opposition Exhibit List**

Carmen Dieppa's Sworn Statement

Email from William Latimer with Agency Decision dated July 2, 2019, sent to Dieppa

Supreme Court Opinion, Fort Bend Count, Texas v. Davis

Deposition Transcript Dan Carter (Defense Witness)

Deposition Transcript Tod Scalf (Defense Witness)

Letter from EEOC Accepting plaintiff's Charge for Investigation

FEMA Mandate 4339

Plaintiff's Answer to Interrogatories, (Defendant's Exhibit 11, Dkt. 94)

AR-15 Investigation, 12¶-13¶ (Defendant's Exhibit 3, Dkt. 94)

EEO Statement, pg. 1-7

Army Report (2) on Suspension of Brig. General Michael Harvey

1

Contrary to the District Court's erroneous findings, Carmen Dieppa elucidates with her Opposition, supporting documents and the record, sufficient facts that could enable a jury to find that the proffered reason for her involuntary reassignment, was a sham intended to cover up her employer's real discriminatory/retaliatory motive.

The District Court judgment should be vacated, and case remanded for further proceedings consistent with this Court's decision. Costs also awarded to Appellant.

## VI.   CONCLUSION

The case was ready and fit for a fact-finding jury trial: A Pretrial Conference was scheduled for June 30, 2021 (Dkt. #65), a Joint Proposed Pretrial Order was filed (Dkt. #80), Pretrial Conference advanced to June 28, 2021 (Dkt. #89), a Pretrial Conference was held, and Pretrial Order thoroughly discussed (Dkt. #108), District Court issued Order setting Jury Trial for December 15, 2021 (Dkt. #101), an Order

was issued instructing parties to supplement Pretrial Order (Dkt. #103) and Parties were instructed to be ready for jury trial with only 2-3 days' notice (Dkt. #155).

Contrary to the District Courts assumption, record is clear in that plaintiff *did* proffer **performance evaluations (2010-Present)**, which were identified in Joint Proposed Pretrial Order (**Add D** Dkt. #80, pag. 39, **Add F**) as her Documentary Evidence. A copy of said documents were either produced to/or obtained from defendant during discovery, and **copies given to the District Court during the Pretrial Conference/Settlement Conference**, in which the Joint Proposed Pretrial Order was thoroughly discussed. Defendant at no time, attempted to use plaintiff's work performance evaluations in support of the Motion for Summary Judgment, because it could not, plaintiff always (has worked for defendant for over 30 years) and *continues* to meet/exceed employer's objective expectations. The investigation into her "leadership" style was supported by either fabricated or uncorroborated subjective statements from her subordinate. Comments about her "leadership" style, not performance. Plaintiff proffered her former supervisor's Dallas Petersen Sworn Statement, one of her witnesses (Dkt. #129, Dkt. #130-1) in which he specifically questioned those statements and assures Carmen always meets high standards of her employer. The Court was aware and noted receipt of her witness expected testimony (Dkt. #151), which begs to question how the District Court assumed defendant "flooded" (Opinion, Dkt. #163, pag. 17) the record with evidence Carmen was not

44

qualified. *With the impeachable* testimony of her subordinates? *Not a single work evaluation supports such improper inference by the Court*. A look at Defendant's Documentary Evidence (Dkt. #80, pag. 39-40) for Trial shows defendant didn't include any performance evaluations, and none were attached as exhibits in support of defendant's dispositive motion. Carmen proffered evidence she met expectations.

The District Court also erroneously assumes Carmen Dieppa has failed to establish her involuntary reassignment during November 2017, was retaliation for protected activity. However, Carmen Dieppa can show a jury with direct and circumstantial evidence, her involuntary reassignment was *retaliatory*:

Defendant's decision "Recommendation for Approval of Management Directed Reassignment" took place *January 25, 2017* (Defendant's Exhibit 5, Pretrial Order at Dkt. #80, pag. 40), *while* her EEOC Case was *pending* and EEOC decision was issued afterward, in July 2017 (Defendant's Exhibit 8, Pretrial Order at Dkt. #80, pag. 40) A fact-finding jury can, because a decision was made *while* her previous EEO case was pending, and testimony of her witness, supervisor Dallas Petersen about the bogus investigation into her "leadership" style with fabricated subordinate statements, considering she always met work performance evaluations, that the proffered reason by defendant was pretextual and decision to involuntarily reassign her *retaliatory*. A defense witness testified William Leyh, individual named in EEO Charge, met with him to discuss Carmen's investigation in July 2017.

Dieppa can and will elucidate specific facts to enable a jury to find defendant's reason was a sham intended to cover up defendant's real motive for reassignment.

Considering the above, this Honorable Circuit Court should conclude *a jury could find* plaintiff Carmen Dieppa was subjected to unlawful workplace practices, including age/gender discrimination and retaliation. Plaintiff wasn't "transferred" to an existing position, but instead reassigned to a newly created non-supervisory Project Manager position. Plaintiff can show circumstantial evidence that Army's alleged legitimate, non-discriminatory reason for her involuntary reassignment was pretextual and was unsubstantiated by evidence, specifically because Second/Final AR-15 report of investigation never recommended any reassignment, and defendant rejected all other lenient options. Plaintiff proffered at Pretrial her work performance evaluations which can show to a jury she always met employer's work expectations. She put on record her former Supervisor's Sworn Statement and Witness for Trial, Dallas Petersen stating AR investigation was a sham and subordinate statements fabricated. Based on damning admissions, she showed defendant offered plaintiff's position to Chico Medina a male under Carmen's PAG. Finally, she can show with direct and circumstantial evidence that unsupported decision to reassign was made on January 2017, while her EEO case was pending, and William Leyh, a named individual in her EEOC Charge, met with her new supervisors on July 2017, to discuss the AR investigation and Carmen, on August 2017, putting her supervisors

on notice concerning her EEOC case. Reassignment occurred a few weeks later. A fact-finding jury could infer the retaliatory animus and wight-in witness credibility.

This Circuit Court has recognized that *reassignment* with significant different responsibilities constitutes *adverse* action. *Cham v. Station Operators, Inc*., 685 F.3d 87, 94 (1st. Cir. 2012) Accordingly, the motion for summary judgment should have been denied, because of the existence of ***disputed facts***, ***credibility issues*** and material ***inferences that should have been made for plaintiff***. Appellant asks to **vacate** because *findings and conclusion are **contrary** to evidence.*

## PRAYER

For the foregoing reasons, the plaintiff-appellant respectfully asks the First Circuit Court of Appeals to reverse the District Court's decision dismissing claims, remand the case back to the District Court of Puerto Rico for a fact-finding *jury trial* and grant relief accordingly. Costs should also be awarded to plaintiff-appellant.

Dated:        January 9, 2023

/s/ Humberto Cobo-Estrella
COBO ESTRELLA LAW OFFICE
PO Box 366451
San Juan, PR 00936-6451
Tel. (787) 529-7140
hcobo@hcounsel.com

/s/ Winston Vidal-Gambaro
Winston Vidal Law Office
PO Box 193673
San Juan, PR 00919-3673
Tel. (787) 751-2864
wvidal@prtc.net

**CERTIFICATE OF COMPLIANCE WITH
TYPE-VOLUME LIMITATION, TYPEFACE
REQUIREMENTS AND TYPE STYLE REQUIREMENTS**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32 (a)(7)(B) because this brief contains approx. 9,069 words, excluding the parts of the brief exempted by Fed. R. App. P. 32 (f).

2.      This brief also complies with the typeface requirements of Fed. R. App. P. 32 (a)(5) and the type style requirements of Fed. R. App. P. 32 (a) (6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in Times New Roman 14 pt. font.

I hereby certify that to the best of my knowledge and belief this brief complies with the Fed. R. App. P. 32 (a) in that as per my word processing system the total word count is approx. 10,641.

/s/ Humberto Cobo-Estrella

## CERTIFICATE OF SERVICE

I, hereby certify that this **_Brief_** and **_Addendum_** was filed electronically through the United States Court of Appeals for the First Circuit's ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on January 20, 2023.

With the following email addresses:

Lisa E. Bhatia Gautier, Esq.     lisa.bhatia@usdoj.gov
Leslie A. Beuttell, Esq.     leslie.a.beuttell.civ@mail.mil

I hereby further certify that on January 9, 2023, plaintiff-appellant has filed a motion for application of order under Fed. R. App. P. 30 (f) to dispense with the filing of an appendix.

/s/ Humberto Cobo-Estrella

Dated:     January 20, 2023

Respectfully submitted,

/s/ Humberto Cobo-Estrella
COBO ESTRELLA LAW OFFICE
PO Box 366451
San Juan, PR 00936-6451
Tel. (787) 529-7140
hcobo@hcounsel.com

/s/ Winston Vidal-Gambaro
Winston Vidal Law Office
PO Box 193673
San Juan, PR 00919-3673
Tel. (787) 751-2864
wvidal@prtc.net

## ADDENDUM TO APPELLANT'S BRIEF

**Table of Contents**                                                    **Ref.**   **Page**

1.  District Court's Opinion and Order, Dkt. #163                 A       1

2.  District Court's Judgment, Dkt. #165                          B       41

3.  ---------Removed 1 st. Cir. R. 28.0(a)(2) (Notice of App)     -       -

4.  Joint Proposed Pretrial Order (Dkt. #80, pag. 39-40)          D       42

5.  Sec. AR Investigation Report Recomm. (Dkt. #94-4, pg. 3,8)    E       45

6.  Plaintiff-Appellant's Work Performance Evaluations            F       47

7.  Defense witness Damning Admissions (Dkt. #110-2)              G       59

8.  Supervisor Dallas Petersen Sworn Statement (Dkt. #130-1)      H       64

9.  ----------Removed 1 st. Cir. R. 28.0(a)(2) (Docket Report)    -       -

**Note:** Brief and Addendum was refiled on January 20, 2023, pursuant Order dated January 13, 2023. The Addendum now, excluding Opinion and Order and Judgment consists of 25 pages (66-41=25) as required. The Notice of Appeal, Docket Report and several miscellaneous pages from Outstanding, Excellent and Satisfactory Work Performance Evaluations were removed from original Addendum to comply with the Court's Order.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

CARMEN QUINTANA-DIEPPA,

     **Plaintiff,**

     **v.**

**DEPARTMENT OF THE ARMY,**

     **Defendant.**

                  Civil No. 19-1277 (ADC)

## OPINION AND ORDER

Before the Court is defendant the Department of the Army's ("the Army" or "defendant") motion for summary judgment and plaintiff Carmen Quintana-Dieppa's ("Quintana" or "plaintiff") opposition thereto. **ECF Nos. 93, 110.** For the reasons below, the Army's motion for summary judgment is **GRANTED.**

### I. Background

Quintana, a 62-year-old female, filed suit against the Army on March 28, 2019. She lodged claims of age discrimination pursuant to the Age Discrimination in Employment Act ("ADEA"), sex and racial discrimination under Title VII of the Civil Rights Act ("Title VII"), and retaliation in violation of Title VII and the Fair Labor Standards Act ("FLSA").[1] **ECF No. 1.** *See also* 29 U.S.C. § 621 *et seq.*; 42 U.S.C. § 2000 *et seq.*; 29 U.S.C. § 215(a)(3). Quintana also alleged she was subjected to a hostile work environment due to her gender in violation of Title VII. **ECF No. 1** at 11.

---

[1] Additional claims have already been dismissed by the Court. *See* **ECF No. 24.**

Quintana's suit stems from seven alleged incidents that are purportedly adverse actions suffered by her and taken by the Army out of a discriminatory or retaliatory animus in violation of ADEA, Title VII and the FLSA. These are:

1. An e-mail sent to Quintana by a supervisor recommending she apply for an open position at a different Army base. **ECF No. 1** at 8.

2. A performance evaluation given to Quintana by a supervisor in which she received a lower grade than she had in previous evaluations. *Id.*

3. Quintana's supervisor's failure to provide her with performance standards. *Id.*

4. Denial of a promotion Quintana had requested. *Id.*

5. Placing Quintana on leave and transferring her to another position. **ECF No. 1** at 9.

6. A text message sent to Quintana by a supervisor questioning her absence from work on a specific date. *Id.*

7. An incident in which Quintana was asked to report to work while on leave and then told to go home once she arrived. *Id.*

Now, the Army moves for summary judgment, maintaining *inter alia* that Quintana cannot establish – even in a *prima facie* manner – that the Army acted with a discriminatory or retaliatory animus in any of the above-mentioned incidents.[2]

---

[2] The Army also argued Quintana failed to exhaust administrative remedies, but it misses the mark. That argument was likely waived because the EEOC reached the merits of Quintana's charge without noting its tardiness, and the Army did not raise it earlier. *See Mercado v. Ritz-Carlton San Juan Hotel, Spa & Casino,* 410 F.3d 41, 45 (1st Cir. 2015).

## II. Summary Judgment Standard

Through summary judgment, courts "pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1st Cir. 1992). The Supreme Court encourages employing summary judgment in federal courts – it "[avoids] full blown trials in unwinnable cases, … [conserves] parties' time and money, and [permits] the court to husband scarce judicial resources." *McCarthy v. Northwest Airlines, Inc.,* 56 F.3d 313, 314 (1st Cir. 1995). *See also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

A court may grant summary judgment only when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See also Sands v. Ridefilm Corp.,* 212 F.3d 657, 660 (1st Cir. 2000). A factual dispute is "genuine" if it could be resolved in favor of either party, and "material" if it potentially affects the outcome of the case. *See Calero-Cerezo v. U.S. Dep't of Justice,* 355 F.3d 6, 19 (1st Cir. 2004). The court must review the record "taken as a whole," and "may not make credibility determinations or weigh the evidence." *Reeves v. Anderson Plumbing Productions Inc.,* 530 U.S. 133, 135 (2000). Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are functions of a jury, not of a judge. *See id.*

In short, when there is a genuine dispute as to any material fact, and when a court would be required to make credibility determinations, weigh the evidence, or draw legitimate

inferences from the facts in order to adjudicate a controversy, summary judgment will not be granted. While no legitimate inferences can be drawn, the court will construe all reasonable inferences in favor of the nonmoving party. *See Stoutt v. Banco Popular de Puerto Rico*, 158 F. Supp. 2d 167, 171 (D.P.R. 2001). Still, the nonmoving party is required to demonstrate "through submissions of evidentiary quality that a trial worthy issue persists." *Iverson v. City of Boston*, 452 F.3d 94, 108 (1st Cir. 2006).

**III. Preliminary Matters**

At the threshold, the Court must stop to address some fatal shortcomings in Quintana's opposition to defendant's motion for summary judgment. **ECF No. 110**. When responding to a motion for summary judgment, parties must abide by certain rules. For example, parties must set forth any proposed uncontested material facts (or rebukes thereto) in numbered paragraphs neatly containing the facts in question, devoid of argumentation and accompanied by specific citations to record materials of evidentiary value that either prove a proposed fact or disprove an opposed one. *See* Fed. R. Civ. P. 56; D.P.R. L. R. 56. Quintana has glaringly failed to comply with this rule, and others as well.

Under Local Rule 56(c):

A party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts. The opposing statement shall admit, deny or qualify the facts supporting the motion for summary judgment… Unless a fact is admitted, the opposing statement shall support each denial or qualification by a record citation as required by this rule…

D.P.R. L. R. 56(c). If a party improperly controverts the facts, the court may treat those facts as uncontroverted. *See Natal Pérez v. Oriental Bank & Tr.*, 291 F.Supp.3d 215, 219 (D.P.R. 2018). Litigants who ignore the rule do so "at their peril." *Puerto Rico American Ins. Co. v. Rivera–Vázquez*, 603 F.3d 125, 131 (1st Cir. 2010). Furthermore, the Court "shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts." D.P.R. L.R. 56(e). *See also Advanced Flexible Circuits, Inc. v. GE Sensing & Inspection Techs. GmbH*, 781 F.3d 510, 521 (1st Cir. 2015) (noting that failure to comply with the standards of Local Rule 56 by the nonmovant allows the district court to accept the moving party's facts as stated).

Quintana opposed or qualified defendant's statements of uncontested material fact ("**DSUMF**s") **8, 14, 28, 29, 31, 33, 37, 38, 39, 46, 47, 51, 54, 57, 60, 61, 62, 63, 67, 75, 76, 85, 89, and 90**. *See* **ECF No. 110-1, Plaintiff's Opposing Statement of Facts** ("**POSF**"). However, the only qualification that comes close to succeeding (albeit partially) is that to **DSUMF 60**, in which the Army posits that plaintiff was not functionally denied a promotion and Quintana responds that she requested a promotion, but her request was denied, and submits deposition testimony to that effect. *See* **PSOF 60.** All other oppositions refer to record citations that do not lend support to Quintana's propositions (**POSF 8, 28, 29, 31, 33, 38, 47, 51, 57, 61, 62, 63, 67, 85**), include propositions that do not contradict the Army's **DSUMF**s (**POSF 8, 29, 31, 33, 37, 38, 39, 51, 54, 57, 61, 67**), or forego citations to the record altogether (**POSF 14, 46, 75, 76, 89, 90**).

For example, **DSUMF 8** states that Quintana was the subject of an investigation. However, Quintana's opposition at **PSOF 8** states only that Quintana "did not know" she was one of the subjects of the investigation and then cites six record materials that neither support that position nor contradict the underlying premise of **DSUMF 8**. Similar problems permeate Quintana's entire opposition. As far as the Court can tell, Quintana copy-pasted the same four record citations throughout most of her oppositions without regard to the matters asserted. To boot, in **PSOF**s **31** and **33,** Quintana egregiously mischaracterizes a witness's testimony.[3] Such a transgression, be it by design or out of carelessness and ignorance, is beyond the pale.

For all the foregoing, Quintana fails to properly contest the Army's proposed uncontested material facts (except **DSUMF 60**, and then only partially).

Furthermore, Quintana attempts to add facts by way of her oppositions, and even admissions, of the Army's **DSUMF**s. For example, Quintana admits **DSUMF 1**, and then includes a full paragraph with additional – and unsupported – facts. **PSOF 1**. Quintana attempts to include similar additional facts throughout her opposition. However, additional facts must be put forward in a separate section, and "set forth in separate numbered paragraphs and supported by a record citation as required by subsection (e) of this rule." D.P.R. L. R. 56(c). "This separate section containing additional facts is necessary to allow the moving party to reply to

---

[3] There, plaintiff cites the witness as stating that plaintiff's reassignment "had nothing to do" with the results of an investigation the Army conducted (generally alluded to as "AR-15") – but the witness actually stated that an unrelated Army regulation (generally alluded to as "Regulation 215") had "nothing to do with the [investigation]." *Compare* **PSOF**s **31** and **33** *with* **ECF 110-7** at 65-66. Both plaintiff's reassignment and the investigation will be discussed in detail below.

those additional facts and to allow the court to easily determine the disputed facts." *Malavé-Torres v. Cusido*, 919 F. Supp. 2d 198, 207 (D.P.R. 2013). A party thus may not include numerous additional facts within its opposition to the moving party's statements of uncontested facts. *See Acevedo–Parrilla v. Novartis Ex–Lax, Inc.*, 696 F.3d 128, 137 (1st Cir. 2012) (citing *Carreras v. Sajo, García & Partners*, 596 F.3d 25, 32 (1st Cir. 2010) (rejecting argument that Local Rule 56(c) does not require separate section for additional facts)). *See also Malavé-Torres*, 919 F.Supp.2d at 207 (nonmoving party "may not include numerous additional facts within its opposition to the moving party's statements of uncontested facts."). As such, per Local Rule 56, all additional facts set forth within plaintiff's opposition of the Army's **DSUMF** shall be disregarded.

Quintana did include additional facts in a separate section. *See* **ECF No. 110-1** at **27-31**. Yet, she did not set forth these additional facts in separate numbered paragraphs, as required by Local Rule 56(c). *Id.* The government, understandably, complained. **ECF No. 132**. The Court should therefore ignore these additional facts because of the undue burden they place upon the Army and the Court. Still, even if the Court considered them, they are by-and-large irrelevant and would not tilt the needle in a different direction.

The Court notes that this is not the first time the Court has needed to call attention to plaintiff's counsels' performance or conduct in this case. **ECF No. 155** ("Plaintiff clearly warned that the next filing containing unsubstantiated allegations, innuendos or mischaracterizations of the record, opposing counsel's posture or allegations will be directly addressed by the imposition of economic sanctions or other measures."); **ECF No. 148** ("particularly plaintiff's

counsel who in spite of previous orders of the Court continues to make unfounded allegations, mischaracterizations and introducing irrelevant facts that affect camaraderie"); **ECF No. 127** ("Plaintiffs failed to appear at today's status conference and the courtroom deputy attempted but remained unable to contact counsel. Defendants waited for 1 hour and the conference was adjourned."); **ECF No. 108** ("In light of recent events that have transpired in the case, attorneys of record were strongly admonished, and the Court will not allow any mischaracterization on pending matters be brought forth within the contents of the documents to be submitted for the Court's consideration.").[4]

### IV. Factual Findings

In accordance with the foregoing, the Court finds that the following material facts are uncontested:

#### i. Quintana's first complaint with the EEOC:

Quintana was employed by the Army as a Child Youth and School Services ("CYSS") Coordinator at Fort Buchanan in Puerto Rico. **DSUMF 1**. In September of 2014, she filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging that she had been discriminated against on the basis of her national origin. **DSMUF 2**. An administrative judge entered judgment in favor of the Army in July of 2017. **DSUMF 5**.

---

[4] The Court also notes that plaintiff's submitted exhibits are not properly organized. The exhibits are not numbered, and the titles used do not match up with the titles referred to throughout the **POSF**. The pages of the depositions filed are out of order, as well. *See* **ECF Nos. 110-6** and **110-7.** This only makes it harder for the Court to do its job. In addition, the Court respectfully requests that counsels for the plaintiff avoid abusing bold and italic characters, since it does not augment plaintiff's arguments. *See inter alia* **ECF Nos. 110, 110-1.**

### ii. First Investigation:

Following allegations of mismanagement and poor work conditions, the 81st Regional Support Command, based in Fort Jackson, South Carolina, initiated an investigation into Fort Buchanan's Family and Morale, Welfare and Recreation ("FMWR") Division in May of 2016. **DSUMF 7**. Quintana, along with the FMWR supervisory chain, was one of the subjects of that investigation.[5] **DSUMF 8**. Upon completion of the investigation, the investigating officer found that Quintana did "not always treat subordinates with dignity and respect or foster a healthy command climate" and that her "authoritative and brash leadership style [had] fostered a toxic work environment." **DSUMF**s **11** and **12** (*quoting* **ECF No. 94-3** at 13). The Commanding General at Fort Jackson accepted the results of the investigation but did not act upon them – instead, he forwarded them to the Garrison Commander at Fort Buchanan. *Id. See also* **DSUMF 13**.

### iii. Follow-Up Investigation:

Fort Buchanan's Garrison Commander, COL Michael T. Harvey ("COL Harvey"), after receiving the results of the investigation, requested a second investigation be conducted into Quintana's treatment of her subordinates. **DSUMF**s **15** and **16**. That follow-up investigation began in late August of 2016 and concluded a little over a month later, in early October. **DSUMF**

---

[5] Specifically, issue #7 of the investigation asked whether Quintana had "violated [Army regulations] by not treating her subordinates with dignity and respect, characterized by harassing, threatening or intimidating behavior and language with specific instances of abuse of authority, disrespect, threats, fear tactics, favoritism, intimidation and retaliation?" **DSUMF 9** (*quoting* **ECF No. 94-3** at 9).

**15**. The investigating officer, after gathering sworn statements and documentary evidence (**DSUMF 24**), made the following findings:

1.  Twenty-seven individuals "confirmed" being the object of or witnessing "disrespectful or disparaging behavior by Ms. Quintana." **DSUMF 17** (*quoting* **ECF No. 94-4** at 2).

2.  "Favoritism, Disrespect, Intimidating language/behavior, and Retaliation were most prominent." *Id.*

3.  "About half of CYSS' [sic] workforce rated Ms. Quintana's leadership unfavorably." **DSUMF 18** (*quoting* **ECF No. 94-4** at 2).

4.  "Personnel leave and staffing is poorly addressed and managed." **DSUMF 19** (*quoting* **ECF No. 94-4** at 3).

5.  "There is a hostile and tense work environment at CYSS. Employees are afraid of [Quintana]. Quintana controls everything, stifles employees' initiative. **DSUMF 20** (*quoting* **ECF No. 94-4** at 4).

6.  Quintana "micromanages CYSS" and "gets personally involved in a myriad [of] inordinate matters that should be instead addressed by her subordinate directors." **DSUMF 21** (*quoting* **ECF No. 94-4** at 4).

7.  "Ms. Quintana treated her employees with lack of dignity and respect." **DSUMF 22** (*quoting* **ECF No. 94-4** at 5).

8.  "The pattern of misconduct warrants disciplinary action." **DSUMF 23** (*quoting* **ECF No. 94-4** at 6).

### iv. The Reassignment:

After receiving the results of the second investigation, COL Harvey, Fort Buchanan's Garrison Commander, signed off on a letter of reassignment to be issued to Quintana on January 25, 2017 by her then supervisor, Daniel Carter ("Carter"). **DSUMF 27**. However, two days earlier, President Donald J. Trump issued a hiring freeze that was not lifted until April 12, 2017. **DSUMF**s **28** and **29**. For that reason, the letter of reassignment's issuance was delayed. *Id.*

In June of 2017, Carter (Quintana's supervisor) vacated his position as FMWR Programs Director (and as Quintana's supervisor) and was replaced by Todd Scalf ("Scalf"). **DSUMF**s **26**, **30** and **37.** Scalf reviewed the files pertaining to the aforesaid investigations and thereafter signed a revised letter of reassignment, transferring Quintana to a newly created position with the same pay and grade. **DSUMF**s **31** and **32**. The letter of reassignment specified that the "justification for this action is that management has serious and substantiated concerns about your management style, which is not conductive to an adequate child care [sic] environment" and then noted several of the findings in the investigation reports. **DSUMF**s **33**, **34** and **35**. The letter was issued to Quintana at a meeting on November 17, 2017. **DSUMF 36**. She was placed on a one-day administrative leave immediately after the meeting. **DSUMF 64**; **ECF 94-5** at 196.

During January of 2018, Wendy Winston ("Winston") – who is a Hispanic female – took on Quintana's duties temporarily. **DSUMF 38**. Then, on January 31, 2018, Aida Aguilú ("Aguilú") was named *Acting* CYSS Coordinator. *Id.* A year later, Aguilú was formally selected

to fill the role on a permanent basis. **DSUMF 39**. Aguilú is a Hispanic female and is only about a year and two months younger than Quintana. **DSUMF**s **40** and **41**.

### v. E-Mail Re: Position in Maryland

Carter forwarded Quintana an e-mail in June of 2016 regarding an open CYSS Coordinator position in Maryland.[6] **DSUMF 46**. Carter said he forwarded the posting because Quintana had expressed numerous times she wanted to leave Fort Buchanan, "that she had too much on her plate, her health was doing well and the job was becoming stressful." **DSUMF 47**.

### vi. Unfavorable Performance Evaluation

In January of 2017, Quintana received a performance evaluation for the period of July 1, 2015 to June 30, 2016. **DSUMF**s **48** and **49**. Carter rated her performance as "satisfactory," because she had met certain standards but had not expanded the youth sports and youth school programs. **DSUMF**s **49** and **50**. Carter noted that these programs were "weak." **DSUMF 51**. In her previous evaluation (for the period of July 1, 2014 to June 30, 2015), Quintana's performance had been rated as "outstanding." **DSUMF 52**. Quintana stated, under oath, that it was "obvious" that the lower rating was "tied to the 15-6 [investigation] results and professional jealousy." **DSUMF 53**.

### vii. Performance Standards Not Provided

Quintana alleges that no performance standards or appraisals were issued to her for the period starting in July 2016 and ending in June 2017. **DSUMF 54**. Carter testified that during his

---

[6] The content of the e-mail is included at fn.19.

time as the acting Program Director of FMWR, neither Quintana, nor any of the fifteen employees Carter supervised received new performance standards. **DSUMF**s **55** and **56**. At least three other employees did not receive performance appraisals for the same time period. **DSUMF 57**. *See also* **ECF No. 94-5** at 203-204. Carter acknowledged that the missing performance reviews were a failure of his supervisory role, due to a heavy workload and an understaffed department. **DSUMF 56**

### viii. Promotion Refusal

In May of 2017, Quintana informed Carter she had reviewed a version of the CYSS manning document and believed that, based on that document, she needed to be non-competitively promoted to a NF-05 Coordinator position – despite that the manning document constituted preliminary guidance issued in advance of any mandate by the U.S. Army Installation Management Command ("IMCOM") G-9 (which commands FMWR and CYSS). **DSUMF**s **61** and **62**. Carter did not submit an electronic request for personnel action promoting Quintana to the position she had requested because Fort Buchanan's CYSS program did not fit the demographics required for that position by the Army NAF Standardized Position Description. **DSUMF 63**.

### ix. November 2017 Text Message

On November 20, 2017, Scalf sent Quintana a text message asking about her whereabouts because she had not reported for work that day.[7] **DSUMF 64**. Quintana perceived the message

---

[7] The content of the text message is included at fn.20.

as disrespectful. **DSUMF 65**. The record does not indicate that Quintana was on preapproved leave or otherwise notified Scalf that she would be taking sick leave before he contacted her by text message. **DSUMF 66**.

### x. January 2018 Incidents

On January 4, 2018, Scalf sent Quintana a "report to work" text message. **DSUMF 68**. On January 5, Quintana explained to Scalf that she was on leave through that day. **DSUMF 69.** Scalf believed, erroneously, that Quintana's leave had concluded on January 3 because of a mix-up with the leave documents. **DSUMF**s **68, 69** and **71**. Upon noticing his mistake, Scalf sent Quintana home. **ECF No. 94-5** at 194.

### V. Discussion

Plaintiff lodges claims of age discrimination pursuant to ADEA, gender and racial discrimination pursuant to Title VII, and retaliation in violation of Title VII and the FLSA. The Court will first address plaintiff's claims of age, gender and racial discrimination under ADEA and Title VII.

### 1. _ADEA and Title VII Discrimination_

ADEA makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." *Vélez v. Thermo King de Puerto Rico, Inc.*, 585 F.3d 441, 446 (1st Cir. 2009) (quoting 29 U.S.C. § 623(a)(1)). The Supreme Court has clarified that, regardless of whether direct or circumstantial evidence is

used to support an ADEA claim, and of whether a burden shifting analysis is employed by the court, plaintiffs must "establish that age was the 'but for' cause of the employer's adverse action." *Gross v. FBL Fin. Servs., Inc.*, 129 S.Ct. 2343, 2351 (2009). Notwithstanding, there is no "heightened evidentiary requirement" for plaintiffs to satisfy their burden of persuasion through "direct evidence" as opposed to "circumstantial evidence." *Id*. at 2351 n. 4. The rule is simply that "[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but for' cause of the challenged employer decision." *Id*. (*citing Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141 143, 147 (2000)).

Title VII, which prohibits discrimination because of sex and nationality, provides "that '[i]t shall be an unlawful employment practice for an employer … to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Oncale v. Sundower Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (*citing* 42 U.S.C. § 2000e– 2(a)(1)).)

In the absence of direct or "smoking gun" evidence, ADEA plaintiffs may nonetheless prove their cases by using the three-stage burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Meléndez v. Autogermana, Inc*., 622 F.3d 46, 50 (1st Cir. 2010). Title VII discrimination claims too are "ordinarily subject to the familiar *McDonnell Douglas* burden-shifting framework." *Caraballo-Caraballo v. Corr. Admin*., 892 F.3d 53, 57 (1st Cir. 2018). *See also Cruz v. Mattis*, 861 F.3d 22, 25 (1st Cir. 2017); *Henderson v. Massachusetts Bay Transportation Auth*., 384 F. Supp. 3d 199, 204 (D. Mass. 2019), aff'd, 977 F.3d 20 (1st Cir. 2020).

Per the burden-shifting framework, a plaintiff must first establish a *prima facie* case of discrimination. *See Thermo King*, 585 F.3d at 447-48. After the *prima facie* showing is made, the burden then shifts to the employer to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason. *Id.* If the employer makes this showing, the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons were not its true reasons, but rather a pretext for discrimination. *Id.* "Where, as here, a plaintiff opposing summary judgment does not have direct evidence of discrimination, we apply the burden-shifting framework." *Joseph v. Lincare, Inc.*, 989 F.3d 147, 157 (1st Cir. 2021).

A. *Prima Facie* Case

The Army argues that Quintana cannot establish a prima facie case of discrimination. While "only a minimal evidentiary showing is necessary to satisfy an employee's burden of production at this stage," *Torrech Hernández v. General Elec. Co.*, 519 F.3d 41, 49 (1st Cir. 2008), Quintana has not hit that mark here with regards to her age, sex and racial discrimination claims.

The Court will address each adverse action individually.[8]

---

[8] The Court will not discuss (a) the e-mail Carter sent to Quintana, (b) the text message Scalf sent Quintana telling her to report to work on a day she was absent, and (c) an incident in which Quintana was mistakenly told to report to work while on leave and then sent home when the mistake was discovered, because they are not adverse actions. *Cherkaoui v. City of Quincy*, 877 F.3d 14, 25 (1st Cir. 2017) ("An adverse employment action is one that affects employment or alters the conditions of the workplace."). Adverse acts "typically involve discrete changes in the terms of employment, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Cham v. Station Operators, Inc.*, 685 F.3d 87, 94 (1st Cir. 2012). "Petty slights or minor annoyances that often take place at work and that all employees experience fall outside the scope of the anti-discrimination laws." *Natal Pérez v. Oriental Bank & Tr.*, 291 F. Supp. 3d 215, 235 (D.P.R. 2018). This applies to ADEA and Title VII claims. *Id.* at 226. Even if these three incidents were adverse

*i. The Transfer*

Involuntary transfers to less desirable positions are often treated as constructive discharges. *Lebofsky v. City of Philadelphia*, 394 F. App'x 935, 939 (3d Cir. 2010). In cases where an employer is not conducting a reduction in force, a plaintiff can establish a *prima facie* claim of discrimination by showing that: (1) they were part of a protected group; (2) they met the employer's legitimate job performance expectations; (3) they experienced an adverse employment action; and (4) the employer had a continuing need for the services provided previously by the plaintiff. *See Velázquez-Fernández v. NCE Foods, Inc.*, 476 F.3d 6, 11 (1st Cir. 2007); *Suárez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1st Cir. 2000).

Quintana was involuntary transferred to a less desirable position. **DSUMF**s **31**, **32 36**.

"When determining whether an employee's performance met the employer's legitimate expectations, an employee's perception of himself is not relevant. Rather, it is the perception of the decision maker which is relevant." *Navedo v. Nalco Chemical, Inc.*, 848 F.Supp.2d 171, 193 (D.P.R. 2012) (cleaned up). Quintana has not pointed to record materials, nor otherwise made an evidentiary showing, that she met the employer's legitimate job performance expectations. *See Velázquez-Fernández*, 476 F.3d at 11. On the other hand, the Army has flooded the record with materials of evidentiary value that support the proposition that Quintana was not meeting her

---

actions, they could not carry a discrimination claim here – Quintana does not demonstrate that these actions constituted disparate treatment, were taken out of a discriminatory animus or were curtained by pretextual justifications. Thus, the ADEA and Title VII claims as pertain to these three incidents are **DISMISSED WITH PREJUDICE**.

employer's legitimate job expectations in several ways. *See* **DSUMF**s **11** and **12** (stating that Quintana's leadership style was authoritative and brash, and she had fostered a toxic work environment); **17**, **18, 19, 20, 21, 22,** and **23** (describing deficiencies in Quintana's leadership, such as exhibiting disrespectful and disparaging behavior towards employees and poor management); **33, 34, 34,** and **35** (management had "serious and substantiated concerns" regarding Quintana's management style, which was termed to not be "conductive to an adequate child care [sic] environment"); **50** (Quintana had not expanded the youth sports and youth school programs); and **51** (the programs headed by Quintana were noted as "weak")**.** And, as aforenoted, Quintana failed to contest or challenge the cited **DSUMF**s. Even with "the minimal evidentiary showing [that] is necessary to satisfy an employee's burden of production at this stage," the omission is glaring and likely fatal. *Torrech Hernández*, 519 F.3d at 49.

Instead, Quintana relies on stating, without more, in her response to the Army's motion for summary judgment, that Quintana had worked for the Army for over 30 years "and no prior history [of prior poor performance or admonishments.]" **ECF 110** at 7. Such a statement, unsupported by record materials and unsubmitted as a material fact, is inconsequential at the summary judgment stage. Quintana's 30 years of employment and accompanying performance record were not submitted as material facts to the Court, and Quintana did not reference record materials to that effect. The First Circuit has held "with a regularity bordering on the monotonous that parties ignore the strictures of an 'anti-ferret' rule at their peril." *Rivera–Vázquez*, 603 F.3d at 131.

In *Woodman*, the Court found that a plaintiff had "cleared [the *McDonnell Douglas* prima facie] hurdle with his proffer of substantial wage increases and ten years of positive performance reviews, blemished by but one negative performance evaluation five days prior to the reduction in force." *Woodman v. Haemonetics Corp.*, 51 F.3d 1087, 1092 (1st Cir. 1995) (*citing Woods v. Friction Materials, Inc.*, 30 F.3d 255, 261 (1st Cir. 1994) (history of largely favorable performance reviews and extensive experience in industry adequate to generate at least a genuine issue as to plaintiff-employee's ability to meet legitimate job expectations)). A similar *evidentiary* proffer is absent here. [9] Quintana, unlike the *Woodman* plaintiff, cannot clear the hurdle on the record presently before the Court.

Notwithstanding, the First Circuit Court of Appeals has consistently held that "we cannot consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case." *Autogermana*, 622 F.3d at 51 (*citing Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir.2 003)). *See also Thermo King*, 585 F.3d at 448 (finding as error that the district court "accepted for the purpose of the *prima facie* analysis [the employer's] stated reason for firing [the plaintiff] as proof that he was not qualified for the … job"). The situation here is different, however, because Quintana has not made *any showing at all* as to whether she was meeting her employer's legitimate expectations. So, rather than accepting

---

[9] The Army submitted an uncontested statement of material fact that Quintana received an "outstanding" performance review for the period of July 1, 2014 to June 30, 2015. However, evidence of a single favorable performance review is not enough to meet even the low standard set forth in *Woodman*. If there is more evidence of favorable performance reviews in the record, Quintana has failed to adequately call the Court's attention to them. *See Rivera–Vázquez*, 603 F.3d at 131 ("parties ignore the strictures of an 'anti-ferret' rule at their peril").

the Army's stated reasons for transferring Quintana, the Court is instead holding simply that Quintana failed to satisfy even the low burden placed upon her by the *McDonnell Douglas* framework at the *prima facie* step. *See Torrech Hernández*, 519 F.3d at 49 (a "minimal evidentiary showing is necessary to satisfy an employee's burden of production at this stage").

Still, the Court will run Quintana's discrimination claims pertaining to the involuntary transfer through the *McDonnell Douglas* gamut, if only for the sake of ensuring that Quintana's performance record was not tarnished by the Army as a pretext to enable a liability-free transfer.

*ii. The Performance Evaluation and the Performance Standards*

With regards to the "satisfactory" performance evaluation she received in January of 2017, **DSUMF**s **48** and **49**, and Quintana's claim that no performance standards or appraisals were issued to her for the period starting in July 2016 and ending in June 2017, **DSUMF 54**, the litmus test for a *prima facie* case changes. To establish a disparate treatment case here, Quintana must show that she was treated more severely, or at least not class neutrally, as compared to others similarly situated and outside her age, sex or race protected classes. *See* 6 Emp. Coord. Employment Practices § 57:20; *Cham v. Station Operators, Inc.*, 685 F.3d 87, 93-94 (1st Cir. 2012).

Quintana did not submit any record materials to form a minimal showing that her lower than usual performance review was discriminatory in any fashion or that similarly situated employees not belonging to her age, sex or race protected classes were graded more favorably. In fact, Quintana instead stated, under oath, that it was "obvious" that the lower rating was "tied to the 15-6 [investigation] results and professional jealousy." **DSUMF 53**. Even taking these

superficial averments as true, such reasons are unrelated to discrimination based on age, sex, or race under the purview of ADEA and Title VII. *See* 29 U.S.C. § 621 *et seq.*; 42 U.S.C. § 2000 *et seq.* Accordingly, Quintana has failed to establish a *prima facie* case of discrimination regarding her ADEA and Title VII claims with respect to the performance evaluation.

Quintana's assertion that no performance standards or appraisals were issued to her for the period starting in July 2016 and ending in June 2017 fares no better. Here, Quintana continues the trend of not submitting record materials to form a minimal showing in support of a *prima facie* case of discrimination. Quintana does not contend or point to evidence that indicates that similarly situated employees not belonging to her age, sex or race protected classes were provided performance standards. This is fatal to her attempt at formulating a *prima facie* ADEA and Title VII discrimination case with regards to the performance standards that were not provided to her. Moreover, it is uncontested that, besides Quintana, a number of employees under Carter's supervision did not receive performance standards or appraisals during the relevant time period. **DSUMF**s **54, 55** and **56**. Quintana accordingly fails.

*iii. Promotion Denial*

Quintana requested a promotion, but her request was denied, and she submits deposition testimony to that effect. *See* **DSUMF 60; PSOF 60.**

To satisfy the *prima facie* burden of ADEA and Title VII failure to promote claims, Quintana must show that: "(1) she is a member of a protected class; (2) she was qualified for the promotion; (3) she was rejected; and (4) that other similarly or less qualified employees, who

were not members of the protected class, were promoted." *Rodríguez-Torres v. Gov't Dev. Bank of Puerto Rico*, 704 F. Supp. 2d 81, 95 (D.P.R. 2010) (cleaned up). "In ADEA claims, the [p]laintiff must also show that the person promoted instead of [p]laintiff was significantly younger than [p]laintiff and had similar qualifications." *Id.* (*citing O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 313 (1996)).

Quintana cannot successfully establish a *prima facie* showing of discrimination on her failure to promote claims because she does not point to evidence in the record showing that anybody was promoted, much less somebody similarly or less qualified to Quintana who was outside of her age, sex, or race protected groups. Quintana has accordingly failed to establish a *prima facie* showing of discrimination on her failure to promote claims. Quintana has also failed to submit evidence that she was qualified for the promotion, or that the position she sought even existed at Fort Buchanan.[10] She, thus, has not established a *prima facie* case of discrimination as it pertains to her failure to promote claims.

B. *Burden shift*

For the sake of thoroughness, the Court notes that even if Quintana had established a *prima facie* showing of discrimination regarding all the aforementioned claims, her ADEA and Title VII claims would still fail because her claims would falter in the later stages of the *McDonnell Douglas* burden-shifting framework.

---

[10] It is uncontested that Fort Buchanan's CYSS program did not fit the demographics required by the Army NAF Standardized Position Description for the position Quintana sought. **DSUMF 63.**

As the First Circuit set forth in *Thermo King*, if the plaintiff establishes a *prima facie* showing of age based discrimination, the court proceeds as follows:

> The burden of production then shifts to the employer to articulate a legitimate, non discriminatory reason for its decisions. If the employer articulates such a reason, the *McDonnell Douglas* framework with its presumptions and burdens is no longer relevant. At this stage, the sole remaining issue is discrimination *vel non*. A plaintiff must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

585 F.3d at 447-48 (cleaned up).

The Army moved evidence into the record that Quintana was transferred (and placed on a one-day administrative leave that was incidental to the transfer) because "management ha[d] serious and substantiated concerns about [her] management style, which is not conductive to an adequate child care [sic] environment" and then noted several of the findings in the reports of two investigations conducted by the Army into Quintana's conduct and performance. **DSUMF**s **33**, **34, 35** and **36**. The Army also pointed to record materials that showed that Quintana had received a lower-than-usual performance review because she had met certain standards but had not expanded the youth sports and youth school programs, which were also noted as "weak." **DSUMF**s **49, 50** and **51**. With regards to the performance standards and appraisals that were not provided for the June 2016-June 2017 period, the Army pointed to evidence explaining that the missing performance standards and appraisals were a failure on Carter's part as supervisor and were a widespread deficiency within his department due to a heavy workload and understaffed department. **DSUMF 56**. With regards to Quintana's failure to promote claims, the

Army produced evidence on record to prove that Carter did not promote Quintana because Fort Buchanan's CYSS program did not fit the demographics required by the Army NAF Standardized Position Description for the position that Quintana believed she was entitled to a promotion for. **DSUMF 63**. Thus, the Army has successfully established legitimate, non-discriminatory reasons for its decisions. *See Thermo King*, 585 F.3d at 447.

   C. *Pretext*

   The Court therefore now moves to the third and final step of the *McDonnell Douglas* framework, where the burden is on plaintiff to show that defendant's asserted reason for its decisions was a pretext for discrimination. *See Santangelo v. New York Life Ins. Co.*, 785 F.3d 65, 70 (1st Cir. 2015). "To meet that burden, '[i]t is not enough for a plaintiff merely to impugn the veracity of the employer's justification; he must 'elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive.'" *Santangelo*, 785 F.3d at 70 (1st Cir. 2015) (*citing Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 824 (1st Cir. 1991)). "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Gómez González v. Rural Opportunities, Inc.*, 626 F.3d 654, 662-663 (1st Cir.2010) (citing *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997)).

*i. The Transfer and One-Day Leave*

Quintana fails to point to anything in the record that comes close to a showing that the Army's proffered and substantiated reasons for the November 2017 involuntary transfer to a less desirable position (and one-day administrative leave that was incidental to the transfer) were a pretext to hide a discriminatory animus. In her opposition to the Army's **DSUMF** and in her additional statement of facts, Quintana cites a witness as stating that plaintiff's reassignment "had nothing to do" with the results of a AR-15[11] investigation – but the witness actually stated that "regulation 215"[12] had "nothing to do with the AR 15-6." *Compare* **PSOF**s 31 and **33; ECF No. 110-1** at 30 *with* **ECF 110-7** at 65-66. Similarly, statements to the effect that Carter did not know why Quintana was transferred and placed on a one-day leave are irrelevant because she has not established that he was involved in the decision to transfer her in the first place. *See* **ECF No. 110-1** at 30. The fact that Scalf and Army leadership relied, in part, on the results of the second investigation into Quintana's performance and conduct to transfer her and place her on an incidental one-day leave (even if the investigation report did not specifically recommend the transfer and Scalf did not recall the specific recommendations at his deposition) is also unavailing to a showing of pretext. *See id.*[13] Indeed, the letter of reassignment stated that "management ha[d] serious and substantiated concerns about [her] management style, which is

---

[11] "AR-15" is a classification of investigation employed by the Army – such as the 2016 investigation into Quintana and several others.

[12] Regulation 215 is an unrelated Army regulation. It has no bearing on the Court's holding.

[13] The additional facts relied on by Quintana to make these assertions need not even be considered by the Court, as she did not comply with Local Rule 56 when submitting them. Still, as discussed herein, they do not aid her.

not conductive to an adequate child care [sic] environment" and then noted several of the findings in the reports of two investigations conducted by the Army into Quintana's conduct and performance. **DSUMF**s **33**, **34, 35** and **36**. As such, the Army does not contend that Quintana was transferred as a direct result of the recommendations of the second investigation, but rather due to "serious and substantiated concerns" that were vindicated by the investigation's results.

Furthermore, the Army entered into evidence record materials stating that the appointing authority (in this case Army leadership at Fort Buchanan) is "neither bound, nor limited, by the findings or recommendations of an investigation." **ECF Nos. 94** at 4 and **94-27** at 15. To boot, the first investigation's recommendations called for Quintana's transfer. **ECF No. 94-3** at 15. *See also Webber v. Int'l Paper Co.*, 417 F.3d 229, 238 (1st Cir. 2005); *Fennell v. First Step Designs, Ltd.*, 83 F.3d 526, 537 (1st Cir. 1996) ("Courts may not sit as super personnel departments, assessing the merits—or even the rationality—of employers' nondiscriminatory business decisions.") (*quoting Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991)). In the end, Quintana did not submit any record materials to suggest that her transfer was in any way discriminatory,[14] to

---

[14] Quintana does submit an additional fact stating that Roberto Medina ("Medina"), a male, was interviewed to fill her former position at some point after April 2018, and was offered the job but he rejected the offer. **ECF 110-1** at 29. However, Quintana does not enter evidence into the record regarding Medina's age, race or qualifications. Still, as pertains to Quintana's sex discrimination case, that Medina emerged as a leading candidate does not sway the Court. By the time Medina was even considered, Quintana's former position had already been occupied for months by women, and one was ultimately chosen to fill it permanently. In ADEA cases, plaintiffs must "establish that age was the 'but for' cause of the employer's adverse action." *Gross v. FBL Fin. Servs., Inc.*, 129 S.Ct. 2343, 2351 (2009). Notwithstanding, and as the Court has noted multiple times, it need not consider Quintana's statement of additional facts because they were improperly submitted to this Court. *See* D.P.R. L. R. 56.

contradict the version of events presented by the Army, or that the Army's decisions hide behind pretexts. The cupboard is truly bare.

Quintana also references in her response to the Army's motion for summary judgment, in passing, that "comments made by supervisors implied she was too old to continue and sought to exclude [her]." **ECF No. 110** at 8. However, Quintana did not submit these alleged comments for the Court's consideration. Thus, for summary judgment purposes, they do not exist. *See* D.P.R. L. R. 56. *See also Rivera–Vázquez*, 603 F.3d at 131.

Quintana accordingly does not meet her burden to "elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive," *Santangelo*, 785 F.3d at 70, or proffer record materials that evince "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Gómez González*, 626 F.3d at 662-663.[15] Quintana has thus failed to demonstrate "through submissions of evidentiary quality that a trial worthy issue persists." *Iverson v. City of Boston*, 452 F.3d 94, 108 (1st Cir. 2006).

"In a case where the first two steps of the *McDonnell Douglas* pavane have been satisfactorily choreographed, a plaintiff must offer some minimally sufficient evidence, direct

---

[15] In addition, the Army has established that Dieppa was replaced first for one month by a Hispanic woman, and later permanently by a Hispanic woman of a similar age. **DSUMFs 38, 39, 40** and **41**.

or indirect, both of pretext and of the employer's discriminatory animus to prevail in the face of a properly drawn Rule 56 motion." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991).

Quintana's ADEA and Title VII discrimination claims pertaining to her transfer and one-day administrative leave therefore fail. They are **DISMISSED WITH PREJUDICE.**

### ii. Other Adverse Actions

The Court now turns to the other adverse events alleged by Quintana. As to them, Quintana does not even formulate a clear attempt to demonstrate that the Army's stated, legitimate reasons were pretextual. Where the standard is to "elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive," *Santangelo*, 785 F.3d at 70, or proffer record materials that evince "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons," *Gómez González*, 626 F.3d at 662-663, the lack of an articulated attack on the Army's proffered reasons is fatal.[16] Quintana has thus failed to demonstrate "through submissions of evidentiary quality that a trial worthy issue persists." *Iverson v. City of Boston*, 452 F.3d 94, 108 (1st Cir. 2006).

---

[16] To the extent that the discussion in the previous section may be relevant here, it is incorporated by reference.

As such, a showing of pretext cannot be sustained. *See Mesnick*, 950 F.2d at 825. For the foregoing reasons, Quintana's claims of discrimination under ADEA and Title VII are **DISMISSED WITH PREJUDICE**.

2. _Hostile Work Environment_

The Army moves for summary judgment dismissing Quintana's claims that she was subjected to a hostile work environment on the basis of her sex in violation of Title VII. The Army argues that summary judgment should be granted on Quintana's hostile work environment claim because "the 'harrasment' she complains of comes nowhere close to being objectively severe or pervasive under binding precedent." **ECF No. 93-1** at 3-4. Quintana did not respond.

In her complaint, Quintana mentions that she "complained to management about the hostile work environment she experienced as a result of the verbally abusive harassment she was subjected to by a subordinate." **ECF 1** at 2. However, Quintana did not exhaust administrative remedies as to any incidents except the seven incidents listed above, *supra* at 2.[17] *See* **ECF No. 94-5** at 134-35. Quintana is thus barred from raising any claims unrelated to those

---

[17] These are, again: (1) An e-mail sent to Quintana by a supervisor recommending she apply for an open position at a different Army base; (2) A performance evaluation given to Quintana by a supervisor in which she received a lower grade than she had in previous evaluations; (3) Quintana's supervisor's failure to provide her with performance standards; (4) Denial of a promotion Quintana requested; (5) Placing Quintana on leave and transferring her to another position; (6) A text message sent to Quintana by a supervisor questioning her absence from work on a specific date; (7) An incident in which Quintana was asked to report to work while on leave and then told to go home once she arrived. **ECF No. 1** at 8-9.

seven incidents in federal court.[18] *Franceschi v. U.S. Dep't of Veterans Affs.*, 514 F.3d 81, 85 (1st Cir. 2008) ("Before an employee may sue in federal court on a Title VII claim, he must first exhaust administrative remedies."); *Labiosa-Herrera v. Puerto Rico Tel. Co.*, 153 F. Supp. 3d 541, 548 (D.P.R. 2016) (granting summary judgment on hostile work environment because plaintiff had failed to exhaust administrative remedies).

The Court has already ruled that four of the seven alleged incidents were nondiscriminatory. *See supra* at 16-27 (ruling that the transfer, the negative performance review, the non-issuance of standards and appraisals, and the failure to promote were not discriminatory). They cannot moor Quintana's Title VII hostile work environment claims because such claims must be premised on conduct that is discriminatory. *Hernández v. Gutierrez*, 656 F. Supp. 2d 101, 105 (D.D.C. 2009).

That leaves three events before the Court: (1) An e-mail sent to Quintana by a supervisor in June 2016 recommending she apply for an open position at a different Army base,[19] (2) a text message sent to Quintana by a supervisor in November 2017 regarding her absence from work

---

[18] Moreover, when asked to identify the instances of harassment she was subjected to, Quintana could not identify any instances. **DSUMF 73**.

[19] The e-mail read as follows:

> Hello Carmen, I was sent this link: [link]. Please don't take this as I am trying to get rid of you. I think it is important to stay competive. You have been here for 25 years and I think you would be great at a larger garrison. The DFMWR is very nice, compassion [sic] and supportive. Again, I am sending this to you because this could be a great opportunity for you and a new challenge if that is what you desire. I am a person that if I don't find a challenge, then I get complacent. You are not complacent but I know you like a challenge. BTW AOG is where Lillian is at. Thank you, Dan.

**ECF No. 94-5** at 216.

on a specific date,[20] and (3) an incident in which Quintana was asked to report to work in January 2018, while on leave, and then told to go home, upon her arrival, when the supervisor realized he was mistaken and unaware she was on approved leave.

A hostile work environment claim exists if a "workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *White v. N.H. Dep't of Corr.*, 221 F.3d 254, 259 (1st Cir. 2000). There is no "mathematically precise test" for determining if conduct reaches the threshold of being so severe or pervasive that it creates a work environment abusive to employees. *Torres-Santiago v. Alcaraz-Emmanuelli*, 617 F. Supp. 2d 26, 36 (D.P.R. 2009) (*quoting Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22–23 (1993)). To determine if a reasonable person would find a work environment hostile or abusive, a court must consider the totality of the circumstances. *See id.* Courts may look to factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id. See also Noviello v. City of Boston*, 398 F.3d 76, 92 (1st Cir.2005).

The conduct underlying Quintana's hostile work environment claim does not satisfy the "severe or pervasive" threshold. For one, the incidents are infrequent, and months apart. A single e-mail was sent in June of 2016. **DSUMF 46.** Then, over a year later, in November 2017,

---

[20] The text read "where are you[?]" and "you [sic] supposed to be here today at 0800hrs, your sick leave request will not be approved…" **ECF No. 94-5** at 134.

she received a text message telling her to come into work. **DSUMF 64.** Nearly a month and a

half later, in January 2018, Quintana again received a text message instructing her to report to

work. **DSUMF 68**.

The content of the communications do not aid Quintana, either. They are "mere offensive

utterances" at the very most, if even that. *Torres-Santiago*, 617 F. Supp.2d at 36. Again, Quintana

received an e-mail recommending she apply for an open position at a different Army base, a

report-to-work text message on the day of an unexcused absence, and an incident in which

Quintana was mistakenly asked to report to work while on leave and then told to go home once

she arrived. A reasonable trier of fact could not find that these incidents are enough to "alter the

conditions of the victim's employment and create an abusive working environment.'" *White*, 221

F.3d at 259. A hostile work environment claim must therefore fail. *Id.*

Besides, the Army has entered evidence into the record articulating legitimate, non-

discriminatory reasons for these three incidents, which remain uncontested: (1) Carter said he

forwarded the posting because Quintana had expressed numerous times she wanted to leave

Fort Buchanan and that she was displeased with her current work, **DSUMF 47**; (2) Quintana was

absent from work and was not on preapproved leave nor had notified Scalf she was sick,

**DSUMF**s **64-67**; and, (3) Scalf believed, erroneously, that Quintana's leave had concluded on

January 3 because of a mix-up with the leave documents, **DSUMF**s **68, 69** and **71**. She has thus

failed to demonstrate "through submissions of evidentiary quality that a trial worthy issue

persists." *Iverson v. City of Boston*, 452 F.3d 94, 108 (1st Cir. 2006).

For the foregoing reasons, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See also Sands,* 212 F.3d at 660. Quintana's Title VII hostile work environment claims are **DISMISSED WITH PREJUDICE**.

3. *Retaliation*

The Army finally moves for summary judgment dismissing Quintana's claims that she was subjected to a fabricated investigation and transferred to a less desirable position as a retaliatory measure in violation of Title VII and the FLSA for having filed a discrimination complaint with the EEOC alleging discrimination on the basis of her national origin. **ECF 1** at 13-14. Quintana indeed filed a national origin discrimination complaint with the EEOC in 2014, that was dismissed in July of 2017. **DSUMF**s **2** and **5**.

A. *FLSA Retaliation*

Right off the bat, the Court must do away with Quintana's FLSA retaliation claim. "The FLSA anti-retaliation provision protects an employee's lawful efforts to secure rights afforded by the FLSA." *Claudio-Gotay v. Becton Dickinson Caribe, Ltd*, 375 F.3d 99, 103 (1st Cir. 2004). The FLSA establishes minimum wage, overtime pay, recordkeeping, and child labor standards affecting full-time and part-time workers in the private sector and in Federal, State, and local governments. *See generally* U.S. Department of Labor, *Handy Reference Guide to the Fair Labor Standards Act.* It does not, however, cover discrimination on the basis of national origin. *See id.* Because Quintana's 2014 EEOC complaint was premised on national origin discrimination, she

cannot pursue a claim of FLSA retaliation here. *See Claudio-Gotay*, 375 F.3d at 103. Quintana's

FLSA retaliation claim is thus **DISMISSED WITH PREJUDICE**.

    *B.  Title VII Retaliation*

    Now, the Court turns to Quintana's Title VII discrimination claims.

    "Title VII's antiretaliation provision forbids employer actions that discriminate against

an employee … because [she] has opposed a practice that Title VII forbids or has made a charge,

testified, assisted, or participated in a Title VII investigation, proceeding, or hearing." *Burlington

N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) (cleaned up). A plaintiff may prove that an

employer took an action with retaliatory intent through direct evidence or through the familiar

*McDonnell Douglas* burden-shifting framework. *See Strothers v. City of Laurel, Maryland*, 895 F.3d

317, 327 (4th Cir. 2018). Here, Quintana has not supplied any direct evidence of retaliatory

animus, so her claim must be evaluated through the lenses of *McDonnell Douglas*-tinted glasses.

    Per the burden-shifting framework, "in order to establish a *prima facie* case of retaliation,

[Quintana] must show that (1) she engaged in protected conduct; (2) she was subjected to an

adverse employment action; and (3) the adverse employment action is causally linked to the

protected conduct." *Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 94 (1st Cir. 2018). After

the *prima facie* showing is made, the burden then shifts to the employer to show that its

purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason. *See

Thermo King*, 585 F.3d at 447-48. If the employer makes this showing, the burden shifts back to

the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons were not its true reasons, but rather a pretext for discrimination. *Id.*

Here, the Court harbors no doubt that Quintana engaged in protected conduct (by filing the 2014 EEOC charge) and will assume without deciding, only for argument purposes, that she was subjected to adverse employment actions. The Court will thus focus its analysis on whether "the adverse employment action is causally linked to the protected conduct." *Id.* Each alleged retaliatory adverse action – namely, two investigations and a transfer, will be addressed below.

With respect to these alleged actions, Quintana can establish a causal connection, as required to build a *prima facie* case of retaliation, either

> (1) indirectly, by showing that the protected activity was followed closely by retaliatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant. A causal connection between a protected action and an adverse employment decision, necessary to establish a prima facie case of Title VII retaliation, may be established by the timing of the adverse employment decision, by evidence that the employer departed from its normal practices, or by evidence that the employer took steps to conceal the reason for its adverse employment action.

Ashworth, Bateman, et al., 21A FEDERAL PROCEDURE § 50:967 (L. Ed.).

> *i. The Investigations*

Following allegations of mismanagement and poor work conditions, the 81st Regional Support Command ("the 81st Command"), based in Fort Jackson, South Carolina, initiated an investigation into Fort Buchanan's FMWR Division in May of 2016. **DSUMF 7**. Dieppa, along

with the FMWR supervisory chain, was one of the subjects of that investigation. **DSUMF 8**. Upon completion of the investigation, the investigating officer found that Dieppa did "not always treat subordinates with dignity and respect or foster a healthy command climate" and that her "authoritative and brash leadership style [had] fostered a toxic work environment." **DSUMF**s **11** and **12** (*quoting* **ECF No. 94-3** at 13). A follow-up investigation was conducted afterwards. **DSUMF**s **15** and **16**.

The Army posits that Quintana cannot demonstrate that the investigations were motivated by a retaliatory animus. Quintana has not made an evidentiary showing in response that could lead a reasonable trier of fact to infer a *prima facie* causal connection between the EEOC 2014 complaint and the 2016-2017 investigations. The Army, on the other hand, has pointed to record materials demonstrating that such a showing is unattainable for Quintana.

The investigations were initiated and conducted by the 81st Command, based in Fort Jackson, South Carolina – not by Fort Buchannan personnel. **DSUMF 7**; **ECF No. 94-3** at 2-3. Quintana has not demonstrated that the officers and officials of the 81st Command were aware of her previous protected activity. One cannot have been motivated to retaliate "by something [one] was unaware of." *Echevarria v. AstraZeneca, LP*, 133 F. Supp. 3d 372, 402 (D.P.R. 2015), *aff'd sub nom. Echevarria v. AstraZeneca Pharm. LP*, 856 F.3d 119 (1st Cir. 2017) (*citing Ameen v. Amphenol Printed Circuits, Inc.*, 777 F.3d 63, 72 (1st Cir.2015)). The timing of the investigations in relation

to the protected activity is not necessarily suspect,[21] there is no evidence that the Army departed

from its normal practices, or that the employer took steps to conceal the reason for the

investigations (instead, the Army's stated reasons for the investigation were set forth in various

memoranda). 21A FEDERAL PROCEDURE § 50:967.

Furthermore, there is no showing that Quintana was treated disparately to fellow

employees by being subjected to an investigation. *See id.* On the contrary, Quintana was

investigated along with two others in the FMWR supervisory chain.[22] **DSUMF 8**; **ECF No. 94-3**

**at 2-3**. And the investigation returned negative results against another supervisor in the FMWR

division, too. **ECF No. 94-3** at 11-12. Quintana has not met her burden per the *McDonnell Douglas*

burden-shifting framework – a *prima facie* case of retaliation therefore cannot be established. *See*

*Rivera-Rivera*, 898 F.3d at 94. Plus, it is well settled that the mere fact of engaging in protected

activity does not excuse an employee from having to follow the rules and fulfill their duties, nor

does it insulate them from warranted employer action and discipline. *See e.g. Planadeball v.*

*Wyndham Vacation Resorts, Inc.*, 793 F.3d 169, 179 (1st Cir. 2015).

---

[21] Even if it was, it would not be enough. Temporal proximity, by itself, cannot show retaliatory motive. *See Skalsky v. Independent School Dist. No. 743*, 772 F.3d 1126 (8th Cir. 2014). "Although temporal proximity itself is insufficient to establish a causal connection between the protected activity and the alleged adverse employment action, as required to demonstrate a prima facie claim of Title VII retaliation, a temporal connection between the protected activity and the alleged adverse employment action coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection." 21A FEDERAL PROCEDURE § 50:967 (citing *Randolph v. Ohio Dept. of Youth Services*, 453 F.3d 724 (6th Cir. 2006)).

[22] The Army's actions after the conclusion of the investigation also speak against Quintana's position that the investigation was retaliatory. The Commanding General at Fort Jackson forwarded the findings of the first investigation to the Garrison Commander at Fort Buchanan, who requested a second, follow-up investigation into Quintana's treatment of her subordinates. **DSUMFs 13, 15** and **16**. That follow-up investigation began in late August of 2016 and concluded a little over a moth later, in early October. **DSUMF 15**. Both investigations, though independent, yielded similar results.

Even if Quintana had established a *prima facie* retaliation case, her claim would nevertheless fail in the subsequent steps of the *McDonnell Douglas* burden-shifting framework. To be sure, the Army provided a legitimate non-retaliatory reason for the investigation – that is, responding to allegations of mismanagement levied against the FMWR supervisory chain. **DSUMF 7**; *See also Thermo King*, 585 F.3d at 447-48. Quintana did not rebut the Army's evidence by demonstrating that the employer's purported nonretaliatory reasons for the investigation were not its true reasons, but rather a pretext for discrimination. *Id.* No such attempt was even made. "In a case where the first two steps of the *McDonnell Douglas* pavane have been satisfactorily choreographed, a plaintiff must offer some minimally sufficient evidence, direct or indirect, both of pretext and of the employer's discriminatory animus to prevail in the face of a properly drawn Rule 56 motion." *Mesnick*, 950 F.2d at 825.

 *ii. The Transfer*

Quintana was involuntary transferred to a less desirable position in November 2017. **DSUMFs 31, 32 36**. She alleges that the transfer was a retaliatory measure. The Army maintains that Quintana cannot show that the transfer was in retaliation for her previous protected conduct in 2014. Indeed, the transfer is even further removed than the investigation, timewise, from the protected conduct. *See* 21A FEDERAL PROCEDURE § 50:967.

Even if Quintana built a *prima facie* case of retaliation (she doesn't), her retaliation claim pertaining to the transfer would nonetheless fail because the Army provided a legitimate non-

retaliatory reason for the transfer which she has failed to rebut by establishing that the purported reason was a pretext to hide a retaliatory animus. *See Mesnick*, 950 F.2d at 825.

The Court has already discussed Quintana's transfer at length. *See supra* at 22-23, 24-27 There, the Court explained that the Army had proffered a non-discriminatory justification for the transfer, and Quintana had failed to establish that the proffered reason was a pretext. *Id.* Quintana's arguments for pretext here are nearly identical to the ones discussed above. *Id.* There is no reason to go into much further detail, save to say that Quintana fares even worse here because the Court has already found that the investigations were not retaliatory. Thus, Quintana fails to meet her burden in the *McDonnell Douglas* burden-shifting framework. *See Strothers*, 895 F.3d at 327.

The Court reminds the reader that Quintana needed to "elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive," *Santangelo*, 785 F.3d at 70, or proffer record material that evince "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-[retaliatory] reasons." *Gómez González*, 626 F.3d at 662-663. Quintana has not come even close to meeting that burden here. Quintana has thus failed to demonstrate "through submissions of evidentiary quality that a trial worthy issue persists." *Iverson v. City of Boston*, 452

**Civil No. 19-1277 (ADC)**                                                    **Page 40**

F.3d 94, 108 (1st Cir. 2006). *See also Mesnick*, 950 F.2d at 825 (failure to provide evidence of pretext at summary judgment stage is fatal).

For all the foregoing reasons, Quintana's Title VII retaliation claims are **DISMISSED WITH PREJUDICE**.

**VI. Conclusion**

In accordance with the reasons stated above, the Court **GRANTS** the Army's motion for summary judgment (**ECF No. 93**). All of Quintana's pending claims are accordingly **DISMISSED WITH PREJUDICE**. Judgment shall be entered accordingly.

**SO ORDERED**.

At San Juan, Puerto Rico, on this 30th day of September, 2022.

**S/AIDA M. DELGADO-COLÓN**
**United States District Judge**

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

**Carmen Quintana-Dieppa,**
**<u>Plaintiff</u>**

      **v.**

**Department of the Army,**
**<u>Defendant</u>**

**Civil No. 19-1277 (ADC)**

## <u>JUDGMENT</u>

The Court, through the Honorable Aida M. Delgado-Colón, U. S. District Judge, issued an Opinion and Order on September 30, 2022.

Therefore, pursuant to the Court's Opinion and Order, judgment is hereby entered. The Court GRANTS the Army's motion for summary judgment (**ECF No. 93**). All of Quintana's pending claims are accordingly **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED AND ADJUDGED,**

In San Juan, Puerto Rico, on this 30th day of September 2022.

                      MARIA ANTONGIORGI-JORDAN, ESQ.
                      Clerk of Court

                      By: S/Génesis Y. Rivera-Soto
                      Génesis Y. Rivera-Soto, Deputy Clerk

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **CARMEN QUINTANA-DIEPPA**<br>*Plaintiff,*<br><br>v.<br><br>**DEPARTMENT OF THE ARMY**<br>*Defendant.* | **CIVIL NO. 19-1277** (ADC)<br>• **ADEA**<br>• **TITLE VII**<br>• **Gender Discrimination**<br>• **Hostile Work Environment**<br>• **Race**<br>• **Retaliation** |

## <u>JOINT PROPOSED PRETRIAL ORDER</u>

**TO THE HONORABLE COURT:**

COME NOW the parties, through their respective counsel and respectfully submit this joint proposed pretrial order for the Court's approval.

### <u>COUNSEL FOR THE PARTIES</u>

<u>**Plaintiff**</u>

Humberto Cobo-Estrella, Esq.         Winston Vidal-Gambaro, Esq.
**USDC-PR230108**                          **USDC-PR 130401**
PO Box 366451                              PO Box 193673
San Juan, Puerto Rico 00936-6451         San Juan, Puerto Rico 00919-3673
Tel. (787) 529-7140                        Tel. (787) 751-286
Email: hcobo@hcounsel.com                 Email: wvidal@prtc.net

<u>**Defendant**</u>

Defendant is represented by Assistant U.S. Attorney Fidel A. Sevillano Del Río, Torre Chardón, Suite 1201, 350 Carlos Chardón Street, San Juan, Puerto Rico 00918; Telephone: 787-766-5656; Facsimile:  787-766-6219 and Leslie Beuttell and Michael Carlson, Trial Attorneys, Department of the United States Army Legal Services Agency, Litigation Division, 9275 Gunston Rd, Fort Belvoir, VA 22060.[1]

---

[1] Counsel Beuttell has been granted special temporary admission (see Attachment A) and Counsel Carlson's request for special temporary admission is pending.

1

**Addendum to Appellant's Brief Page 42**

## PHRASES THAT COULD BE USED DURING TRIAL

### Plaintiff and Defendant

These will be supplied to the Court Reporter as they arise.

## LENGTH OF TRIAL

### Plaintiff and Defendant

One week.

## DOCUMENTARY EVIDENCE

### Plaintiff

Plaintiff intends to use the following enumerated documents in support her claim:

EEOC Charge No. 510-2015-00273X

Public Notice 4339-DR-PR

EEOC Charge No. 510-2019-00015X

Public Law 92-261, AR 215-3, AR-15-6, AR 690-12 IAW Regulation

15-6 Investigation (first) Report

15-6 Investigation (second) Report

Plaintiff's Performance Evaluations (2010-present)

The plaintiff reserves the right to timely modify the above reference list of documents before Trial. In addition, plaintiff also reserves the right to use any of defense's documents.

The plaintiff does not waive her right to object any of the documents listed by Defendants as evidence.

### Defendant

Exhibit 1, EEO Complaint ARFTBUCH14AUG03082

Exhibit 2, Order Entering Judgment for EEO Case (regarding Complaint ARFTBUCH14AUG03082)

Exhibit 3, 15-6 Investigation Conducted by 81st

Exhibit 4, Report of Proceedings by Investigating Officer (completed on October 7, 2016)

Exhibit 5, January 25, 2017, Garrison Commander, COL Michael T. Harvey's "Recommendation for Approval of Management Directed Reassignment"

Exhibit 6, Presidential Memorandum Regarding the Hiring Freeze | The White House

Exhibit 7, April 12, 2017 Memorandum For Heads of Executive Departments and Agencies

Exhibit 8, Final Agency Decision

Exhibit 9, 15-6 Investigation Appeal/Consideration submitted by Carmen Dieppa

Exhibit 10, Guide to Informal Investigations for Investigating Officers

Exhibit 11, November 17, 2017, notice of reassignment

Exhibit 12, Dieppa's Time-sheets

Exhibit 13, Dieppa's EEO training records and corresponding training materials

Exhibit 14, Plaintiff's Public Profile on Facebook

Exhibit 15, Dieppa' Home Leave

Exhibit 16, Dieppa's Flight Schedule

Exhibit 17, Email from Dieppa to Scalf dated Monday, December 11, 2017 at 7:12 am

Exhibit 18, Email from Dieppa to Scalf dated Monday, December 11, 2017 at 10:22 pm and attached "medical certificate"

Exhibit 19, Email from Scalf to Latimer dated January 4, 2018 at 9:36 am and attachments

Exhibit 20, Army Regulation 15-6

Defendant reserves the right to timely modify the above reference list of documents before Trial. In addition, Defendant reserves the right to use any of Plaintiff's documents. However, Defendant does not waive its right to object any of the documents listed by Plaintiff as evidence.

**IT IS ORDERED** that this Pretrial Order may be modified at the trial of the action, or prior thereto, to prevent manifest injustice. Such modification may be made either by application of counsel for the parties or on motion of the Court.

RESPECTFULLY SUBMITTED in San Juan, Puerto Rico, this 16 day of June 2021.

Entry ID: 6545656

Date Filed: 01/26/2023

Page: 95

Document: 0117968614

Case: 22-1858

**SECTION IV - FINDINGS** *(para 3-10, AR 15-6)*

The *(investigating officer)*, having carefully considered the evidence, finds: *[Each paragraph should be one conclusion based on the evidence gathered during the investigation. These findings should provide answers to each question posed by the appointing authority in the appointment memorandum. The evidence that supports each finding must be cited.]*

**A- ABOUT HALF OF CYSS' WORKFORCE RATED MS. DIEPPA FAVORABLY**

1. 28 of the former and present CYSS employees interviewed denied having been the object of or having witnessed disrespectful or disparaging behavior by Ms. Dieppa. See exhibits "A" through "BB". 9 out of these 28 were recent (under 6 month) hires (exhibits A through I). These 28 employees generally gave Dieppa high marks as a leader. 16 of the 28 granted her all of the attributes listed at survey question 7 (exhibits A, B, C, F, G, H, J, O, P, Q, R, S, T, V, Y, AA). The remaining 12 stressed her mission accomplishment, discipline and subordinates' wellbeing. In general, they commended Dieppa for her professionalism and dedication to her job. One of them (exhibit L) remarked that Ms. Dieppa could be deemed a micro-manager, but only as a result of Garrison and MWR managements' own micromanagement; and that the institutional pressure to always please the customers no-matter-what led to a tense workplace environment. An employee (exhibit Q) gratuitously opined that this investigation was instigated by employees who failed to do their job, to wit, Lisa Crawford and Tiffny Lane. Another (exhibit K) tersely claimed not having problems w/ Dieppa only because she knew how to defend herself. The employee at Exhibit "M" stated that Dieppa's lacked empathy for her subordinates' opinions.

**B. SOME EMPLOYEES REFLECTED MIXED FEELINGS ABOUT MS. DIEPPA'S LEADERSHIP**

2. Even though an additional 7 of the former and present CYSS employees interviewed (exhibits CC through II) denied having been the object of or having witnessed disrespectful or disparaging behavior by Ms. Dieppa when answering survey question 6, they remarked thereafter that she was unfair, unnecessarily belittled employees in staff meetings; that labor environment was tense; and that there was fear of reprisals. One employee (exhibit DD) questioned the lawfulness of two CYSS supervisors having their daughters working in CYSS as well. Others (exhibits CC, GG) complained that personnel was promoted unfairly; that Ms. Dieppa proclaimed that she placed and removed whomever she wanted regardless of seniority or educational background; and that Ms. Dieppa came across as haughty and authoritarian. One of these employees (exhibit HH) related that CYSS lacked a cogent contingency plan for legitimate employees' absences. This employee alleged having been given a hard time due to absences related to her child's illness, grandmother's demise and husband's deployment; received no support, and was made to feel like she was an irresponsible employee whenever she needed to take time off for the aforesaid reasons.

**C. ABOUT HALF OF CYSS' WORKFORCE RATED MS. DIEPPA's LEADERSHIP UNFAVORABLY**

3. 27 of the former and present CYSS employees interviewed (exhibits JJ through JJJ) confirmed having been the object of or having witnessed disrespectful or disparaging behavior by Ms. Dieppa. Favoritism, Disrespect, Intimidating language/behavior and Retaliation were most prominent. Out of these testimonies/interviews, the following specific events/situations are highlighted.

a. In an e-mail exchange with an employee dated 24 August 2015, Ms. Dieppa represented to an employee that there was a requirement to submit a medical certificate upon three days of sick leave when in truth and in fact AR 215-3 does not require a certificate unless leave is for MORE than three days. This would confirm this and other employees' assertion that Ms. Dieppa twists the meaning of words proffered by others. In this instance Dieppa misrepresented the regulation's clear language (exhibits L, ZZ, AAA, BBB, CCC).

b. An employee (exhibit MM) refused to be interviewed and sign a statement for instant investigation for fear of reprisals by Ms. Dieppa. Another (exhibit DD), asked whether the statement would be confidential and that the employees were afraid of reprisals.

c. An employee (exhibit NN) refused to sign a statement for purported religious reasons but was nevertheless interviewed. She related that Dieppa belittled her about three months ago when the (part time) employee asked Dieppa for a morning shift in order to finish off adoption proceedings of a 9 year/old boy and foster maternal bonding. Ms. Dieppa immediately thereafter assigned this employee the afternoon shift.

d. A reservist employee (exhibit OO) has had to cancel active duty for training orders because Ms. Dieppa refuses or resists granting him military leave.

**Addendum to Appellant's Brief Page 45**

Entry ID: 6545656   Date Filed: 01/26/2023   Page: 96   Document: 0117968614   Case: 22-1858

**SECTION V - RECOMMENDATIONS** *(para 3-11, AR 15-6)*

In view of the above findings, the *(investigating officer)* recommends: *[Each paragraph should be one recommendation based on the findings in Section IV. Address what actions, if any, should be taken with regard to the individuals involved, the unit leadership, and any steps that can be taken to prevent the occurrence in the future. Recommendations do not need to be adverse or punitive. For example, the investigation results can be used as a training tool.]*

1. That Ms. Dieppa be placed in a one-year Performance Improvement Plan addressing her "Supervision" objective. It should require her to delegate, at the very least, personnel scheduling, leave administration, personnel tasking, personnel evaluation, and the assigned budget's administration to the CDC, SAC, Outreach and MS/T Directors. Ms. Dieppa's necessary coordination to cross-support CYSS' activities must be made through the concerned directors and not directly with the employees working under said directors.

2. That the SAC, Outreach and MS/T Directors be placed each in a one-year Performance Improvement Plan addressing their "Program Administration" objective. It should require that each of them to take ownership of their intrinsic managerial duties, to wit, personnel scheduling, leave administration, personnel tasking, personnel evaluation, and the assigned budget's administration.

3. That CYPA Eileen Santiago be transferred (not detailed) forthwith to the MS/T at Building 148.

4. That CYPA Camille Tiburcio be barred from supporting the Training and Curriculum Specialists in any way or manner.

5. That the selection process of the CDC Director be accomplished within NLT 45 days. In the meanwhile, that the Assistant Director be appointed acting Director.

6. That the transfer of Glory Ann Gierbolini out of the CDC be reversed and held in abeyance until a CDC Director is on board. Removing Gierbolini before then reduces the institutional knowledge available to the recently arrived Assistant Director and unnecessarily stresses the transition process. It also affords Ms. Dieppa and excuse to again engage in micro-managing at the CDC.

7. That MWR, Garrison, and CPAC coordinate a line of effort that will enable CYSS to build up and sustain a suitable pool of CYPA FLEX Employees.

8. That Ms. Dieppa receive a two-year letter of reprimand for Discourtesy, grounds being for "engaging in a pattern of intimidation and offensive behavior against CYSS employees from 2013 until present consisting in (a) repeatedly daring employees to seek employment elsewhere; and (b) fomenting a workplace climate of mistrust and suspicion through a subordinate network of confidential informers."

9. That the specific performance deficiencies at paragraph 2a ("knowledge of the job") and 2d ("professional representation") of Ms. Lisa Crawford's current Performance Improvement Plan be deleted and not further considered in Ms. Crawford's PIP. The former is not defined in a manner that can be constructively entertained. The latter amounts to a suspect subjective and improvident judgment given Ms. Dieppa's own demonstrated shortcomings.

10. That in order to avoid the future appearance of retaliation the supporting statements in this investigation remain sealed and unpublished except when meeting narrowly construed need-to-know criteria.

2003-2010.

# NONAPPROPRIATED FUND INSTRUMENTALITY
## EMPLOYEE PERFORMANCE RATING

For use of this form, see AR 215-3; the proponent agency is DCS, G1.

| 1. NAME *(Last, first, MI)* | 2. SSN |
|---|---|
| Dieppa, Carmen M | ▮▮▮▮5449 |

| 3a. POSITION TITLE | 3d. I AGREE THAT THE JOB DESCRIPTION ACTUALLY REFLECTS THE DUTIES OF THE POSITION | |
|---|---|---|
| CYS Coordinator | | |
| **b. POSITION NUMBER** AM323 | **c. GRADE** NF-1701-04 | SUPERVISOR'S INITIALS     EMPLOYEE'S INITIALS |

**4. NAME AND LOCATION OF EMPLOYING OFFICE**
Directorate of Family and Morale, Welfare and Recreation
Fort Buchanan
390 Crane Loop
Fort Buchanan, PR 00934

| 5. TYPE OF RATING | 6. RATING PERIOD | |
|---|---|---|
| ☒ ANNUAL    ☐ PROBATIONARY | **FROM *(YYYYMMDD)*** | **TO *(YYYYMMDD)*** 20100630 |

**7. RETENTION AFTER PROBATIONARY PERIOD**

☐ RECOMMENDED       ☐ NOT RECOMMENDED

**8. THE OFFICIAL RATING ASSIGNED**

☒ OUTSTANDING (4)     ☐ SATISFACTORY (2)     ☐ UNSATISFACTORY

☐ EXCELLENT (3)     ☐ MINIMALLY SATISFACTORY (1)

| 9a. SUPERVISOR'S SIGNATURE | 9b. DATE |
|---|---|
| DÁLLAS J. PETERSEN | |
| **10a. APPROVING OFFICIAL'S SIGNATURE** | **10b. DATE** |
| GUNNAR G. PEDERSEN | 20100730 |
| **11a. EMPLOYEE'S SIGNATURE** | **11b. DATE** |
| CARMEN M. DIEPPA | 2010 04 20 |

*(Employee's signature does not necessarily constitute agreement with the rating, but does acknowledge that position description is accurate and discussion has been held concerning performance with the rating period.)*

DA FORM 3612, JAN 2002      EDITION OF FEB 84 IS OBSOLETE      APD PE v1.00

Addendum to Appellant's Brief Page 47

2010-2011

## NONAPPROPRIATED FUND INSTRUMENTALITY
## EMPLOYEE PERFORMANCE RATING

For use of this form, see AR 215-3; the proponent agency is DCS, G1.

| 1. NAME *(Last, first, MI)* | | | 2. SSN |
|---|---|---|---|
| Dieppa, Carmen M | | | ▓▓5449 |

| 3a. POSITION TITLE | | 3d. I AGREE THAT THE JOB DESCRIPTION ACTUALLY REFLECTS THE DUTIES OF THE POSITION. | |
|---|---|---|---|
| CYS Coordinator | | | |
| b. POSITION NUMBER | c. GRADE | SUPERVISOR'S INITIALS | EMPLOYEE'S INITIALS |
| AM323 | NF-1701-04 | *[initials]* | *CMD* |

4. NAME AND LOCATION OF EMPLOYING OFFICE
Directorate of Family and Morale, Welfare and Recreation
Fort Buchanan
390 Crane Loop
Fort Buchanan, PR 00934

| 5. TYPE OF RATING | 6. RATING PERIOD | |
|---|---|---|
| ☒ ANNUAL    ☐ PROBATIONARY | FROM *(YYYYMMDD)*<br>20100701 | TO *(YYYYMMDD)*<br>20110630 |

**7. RETENTION AFTER PROBATIONARY PERIOD**

☐ RECOMMENDED          ☐ NOT RECOMMENDED

**8. THE OFFICIAL RATING ASSIGNED**

☒ OUTSTANDING (4)          ☐ SATISFACTORY (2)          ☐ UNSATISFACTORY

☐ EXCELLENT (3)          ☐ MINIMALLY SATISFACTORY (1)

| 9a. SUPERVISOR'S SIGNATURE | 9b. DATE |
|---|---|
| DALLAS J. PETERSEN | 2011 07 17 |
| 10a. APPROVING OFFICIAL'S SIGNATURE | 10b. DATE |
| GUNNAR G. PEDERSEN | 2011 07 18 |
| 11a. EMPLOYEE'S SIGNATURE | 11b. DATE |
| CARMEN M. DIEPPA | 2011 07 19. |

*(Employee's signature does not necessarily constitute agreement with the rating, but does acknowledge that position description is accurate and discussion has been held concerning performance with the rating period.)*

DA FORM 3612, JAN 2002          EDITION OF FEB 84 IS OBSOLETE          APD PE v1.00

# NONAPPROPRIATED FUND INSTRUMENTALITY
## EMPLOYEE PERFORMANCE RATING

For use of this form, see AR 215-3; the proponent agency is DCS, G1.

| 1. NAME *(Last, First, MI)* |
| --- |
| Dieppa, Carmen M. |

| 2a. POSITION TITLE | 2b. POSITION NUMBER | 2c. GRADE |
| --- | --- | --- |
| Child, Youth & School Coordinator | NF-1701 | 04 |

| 2d. I AGREE THAT THE JOB DESCRIPTION ACTUALLY REFLECTS THE DUTIES OF THE POSITION. | SUPERVISOR'S INITIALS | EMPLOYEE'S INITIALS |
| --- | --- | --- |

**3. NAME AND LOCATION OF EMPLOYING OFFICE**

| 4. TYPE OF RATING | 5. RATING PERIOD | |
| --- | --- | --- |
| ☑ ANNUAL    ☐ PROBATIONARY | FROM *(YYYYMMDD)* | TO *(YYYYMMDD)* |

**6. RETENTION AFTER PROBATIONARY PERIOD**

☐ RECOMMENDED          ☐ NOT RECOMMENDED

**7. THE OFFICIAL RATING ASSIGNED**

☐ OUTSTANDING (4)          ☐ SATISFACTORY (2)          ☐ UNSATISFACTORY

☑ EXCELLENT (3)          ☐ MINIMALLY SATISFACTORY (1)

| 8a. SUPERVISOR'S SIGNATURE | 8b. DATE *(YYYYMMDD)* |
| --- | --- |
| PETERSEN.DALLAS.J.1235080130 | 20120713 |

| 9a. APPROVING OFFICIAL'S SIGNATURE | 9b. DATE *(YYYYMMDD)* |
| --- | --- |
| | 20120723 |

| 10a. EMPLOYEE'S SIGNATURE | 10b. DATE *(YYYYMMDD)* |
| --- | --- |
| | 2012 0815 |

*(Employee's signature does not necessarily constitute agreement with the rating, but does acknowledge that position description is accurate and discussion has been held concerning performance with the rating period.)*

**DA FORM 3612, NOV 2008**          PREVIOUS EDITIONS OBSOLETE.          APD PE v1.01ES

*2012->2013*

# NONAPPROPRIATED FUND INSTRUMENTALITY
## EMPLOYEE PERFORMANCE RATING

For use of this form, see AR 215-3; the proponent agency is DCS, G1.

**1. NAME** *(Last, First, MI)*

Dieppa, Carmen M.

| 2a. POSITION TITLE | 2b. POSITION NUMBER | 2c. GRADE |
|---|---|---|
| Child, Youth & School Coordinator | NF-1701 | 04 |

| 2d. I AGREE THAT THE JOB DESCRIPTION ACTUALLY REFLECTS THE DUTIES OF THE POSITION. | SUPERVISOR'S INITIALS | EMPLOYEE'S INITIALS |
|---|---|---|
| | X | |

**3. NAME AND LOCATION OF EMPLOYING OFFICE**

| 4. TYPE OF RATING | 5. RATING PERIOD | |
|---|---|---|
| [✓] ANNUAL    [ ] PROBATIONARY | FROM *(YYYYMMDD)* 20120701 | TO *(YYYYMMDD)* 20130630 |

**6. RETENTION AFTER PROBATIONARY PERIOD**

[ ] RECOMMENDED          [ ] NOT RECOMMENDED

**7. THE OFFICIAL RATING ASSIGNED**

[✓] OUTSTANDING (4)          [ ] SATISFACTORY (2)          [ ] UNSATISFACTORY

[ ] EXCELLENT (3)          [ ] MINIMALLY SATISFACTORY (1)

| 8a. SUPERVISOR'S SIGNATURE | 8b. DATE *(YYYYMMDD)* |
|---|---|
| PETERSEN.DALLAS.J.1235080130 | 20130516 |

| 9a. APPROVING OFFICIAL'S SIGNATURE | 9b. DATE *(YYYYMMDD)* |
|---|---|
| | 22 May 2013 |

| 10a. EMPLOYEE'S SIGNATURE | 10b. DATE *(YYYYMMDD)* |
|---|---|
| | 2013 July-17 |

*(Employee's signature does not necessarily constitute agreement with the rating, but does acknowledge that position description is accurate and discussion has been held concerning performance with the rating period.)*

**DA FORM 3612, NOV 2008**          PREVIOUS EDITIONS OBSOLETE.          APD PE v1.01ES

Addendum to Appellant's Brief Page 50

*Plaintiff's Exhibits Page 061*

2013-2014

## NONAPPROPRIATED FUND INSTRUMENTALITY
## EMPLOYEE PERFORMANCE RATING

For use of this form, see AR 215-3; the proponent agency is DCS, G1.

| 1. NAME (Last, First, MI) | | |
|---|---|---|
| Dieppa, Carmen M. | | |

| 2a. POSITION TITLE | 2b. POSITION NUMBER | 2c. GRADE |
|---|---|---|
| Child, Youth & School Coordinator | NF-1701 | 04 |

| 2d. I AGREE THAT THE JOB DESCRIPTION ACTUALLY REFLECTS THE DUTIES OF THE POSITION. | SUPERVISOR'S INITIALS | EMPLOYEE'S INITIALS |
|---|---|---|
| | | CMD |

**3. NAME AND LOCATION OF EMPLOYING OFFICE**

| 4. TYPE OF RATING | | 5. RATING PERIOD | |
|---|---|---|---|
| ☑ ANNUAL    ☐ PROBATIONARY | | FROM (YYYYMMDD) 20130701 | TO (YYYYMMDD) 20140630 |

**6. RETENTION AFTER PROBATIONARY PERIOD**

☐ RECOMMENDED          ☐ NOT RECOMMENDED

**7. THE OFFICIAL RATING ASSIGNED**

☑ OUTSTANDING (4)          ☐ SATISFACTORY (2)          ☐ UNSATISFACTORY

☐ EXCELLENT (3)          ☐ MINIMALLY SATISFACTORY (1)

| 8a. SUPERVISOR'S SIGNATURE | 8b. DATE (YYYYMMDD) |
|---|---|
| Dallas J. Petersen, Director, FMWR | AUG 0 7 2014 |

| 9a. APPROVING OFFICIAL'S SIGNATURE | 9b. DATE (YYYYMMDD) |
|---|---|
| William B. Leyh   WILLIAM S. LEYH, D2GC | AUG 0 7 2014 |

| 10a. EMPLOYEE'S SIGNATURE | 10b. DATE (YYYYMMDD) |
|---|---|
| CARMEN M. DIEPPA | 2014 08 14 |

*(Employee's signature does not necessarily constitute agreement with the rating, but does acknowledge that position description is accurate and discussion has been held concerning performance with the rating period.)*

**DA FORM 3612, NOV 2008**          PREVIOUS EDITIONS OBSOLETE.          APD PE v1.01ES

*74*

## NONAPPROPRIATED FUND INSTRUMENTALITY
## EMPLOYEE PERFORMANCE RATING

For use of this form, see AR 215-3; the proponent agency is DCS, G1.

**1. NAME** *(Last, First, MI)*
Quintana, Carmen M.

| 2a. POSITION TITLE | 2b. POSITION NUMBER | 2c. GRADE |
|---|---|---|
| CYSS Coordinator | NF-1701 | 04 |

| 2d. I AGREE THAT THE JOB DESCRIPTION ACTUALLY REFLECTS THE DUTIES OF THE POSITION. | SUPERVISOR'S INITIALS | EMPLOYEE'S INITIALS |
|---|---|---|
| | DJP | CMQ |

**3. NAME AND LOCATION OF EMPLOYING OFFICE**
FMWR
390 Crane Loop
Suite 100
Fort Buchanan, PR 00934

**4. TYPE OF RATING**
[✓] ANNUAL   [ ] PROBATIONARY

**5. RATING PERIOD**
FROM *(YYYYMMDD)* 20140701
TO *(YYYYMMDD)* 20150630

**6. RETENTION AFTER PROBATIONARY PERIOD**
[ ] RECOMMENDED   [ ] NOT RECOMMENDED

**7. THE OFFICIAL RATING ASSIGNED**
[✓] OUTSTANDING (4)   [ ] SATISFACTORY (2)   [ ] UNSATISFACTORY
[ ] EXCELLENT (3)   [ ] MINIMALLY SATISFACTORY (1)

**8a. SUPERVISOR'S SIGNATURE**
PETERSEN.DALLAS.J.1235080130

**8b. DATE** *(YYYYMMDD)* 20150730

**9a. APPROVING OFFICIAL'S SIGNATURE**

**9b. DATE** *(YYYYMMDD)* 20150807

**10a. EMPLOYEE'S SIGNATURE**

**10b. DATE** *(YYYYMMDD)* 20150807

*(Employee's signature does not necessarily constitute agreement with the rating, but does acknowledge that position description is accurate and discussion has been held concerning performance with the rating period.)*



Attachment to Evaluation

Carmen Dieppa

Rating Period Ending 6/30/2015

During this rating period Ms. Dieppa did an outstanding job exceeding every and all standards during this rating period. In Addition during this rating periods she scored in the 90 per centile in inspections and is/ has become an IMCOM expert in the process of Background checks and the reporting process.

Dallas J Petersen

*First Set od Interrogatory*
*Questions #20 and #24*

| CIVILIAN PERFORMANCE PLAN | | |
|---|---|---|
| for use of this form, see AR 690-400, chapter 430; the proponent agency is DCSPER | | PAGE 2 OF 2 PAGES |

### PART 1 - ADMINISTRATIVE DATA

| 1. NAME (Last, First, MI) AND SSN | 2. NAME AND LOCATION OF EMPLOYING OFFICE |
|---|---|
| Dieppa, Carmen M. 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 | Directorate of Family and MWR<br>390 Crane Loop, Suite 100 Fort Buchanan, PR 00394-4614 |

| 3. POSITION TITLE AND NUMBER, PAY PLAN, SERIES AND GRADE/LEVEL | 4. RATING PERIOD | |
|---|---|---|
| CYS Coordinator, AM323, NF-1701-04 | FROM (YYYYMMDD)<br>20150701 | TO (YYYYMMDD)<br>20160630 |

### PART II – PERFORMANCE ELEMENTS AND STANDARDS

| JOB ELEMENTS<br>a | CE<br>b | PERFORMANCE STANDARDS<br>C |
|---|---|---|
| 7. Quality Control | | 7. Follows all quality control regulations/policies related to key control, property, and any other controlled areas of operation. |
| 8. EEO | | 8. Supports EEO program, observes its regulations, and provides access to channeling complaints. |
| 9. CLS.PMR | | 9. Manages programs using CLS guidelines and principles. Reports CLS/PMR data quarterly meeting all suspense's. |
| 10. Customer Service | | 10. Assesses and meets customer needs by delivering high quality products and services to internal and external customers at the agreed upon time. Stays focused on customer need by maintaining effective positive communication. Listens to, accepts, and acts upon customer feedback to improve programs and services. Works diligently to find a solution or alternate solution to satisfy customer needs in a timely manner. Exhibits Customer Service skills by projecting appositive attitude to customers and fellow team members on a consistent and regular basis. Treats team members and customers with courtesy and respect consistently. Involves employees and superiors when necessary in the program solving and decision making process. Sets the standard for customer service to team members by leading by example with customer service interactions on a regular basis. Provides frequent feedback and coaching on team member's customer service performance so that they know they are reaching their goals. Recognizes and rewards teams and individuals who demonstrate outstanding customer service or who meet or exceed their customer service goals on a regular basis. |
| 11. Local Partnerships | | 11. Initiates and maintains partnerships with both on- and off- post organizations and local schools serving children and youth |
| 12. Respecting dignity | | 12. Ensure that you treat all employees with Respect and Dignity. |

### PART III – AUTHENTICATION

| | SIGNATURE | DATE | SIGNATURE | DATE |
|---|---|---|---|---|
| 1<br>SUPERVISOR | *[signature]* | 7/30/15 | Dallas J. Petersen<br>Director, Family and MWR | |
| | Dallas J. Petersen<br>Director, Family and MWR | | | |
| 2<br>REVIEWER/<br>APPROVING<br>OFFICIAL | *[signature] William D. Leyh* | 8/07/15 | WILLIAM S. LEYH<br>Deputy to the Garrison Commander | |
| | WILLIAM S. LEYH<br>Deputy to the Garrison Commander | | | |
| 3<br>EMPLOYEE* | *[signature]* | 8/07/15 | Carmen Dieppa<br>CYSS Coordinator | |
| | Carmen Dieppa<br>CYSS Coordinator | | | |

*Employee signature indicates that discussion, not necessarily agreement, has occurred.*

DA FORM 5397, DEC 86    DA FORM 5397-R MAY 90 MAY BE USED

**Plaintiff's Exhibits Page 069**

2   ≥EO case was still going on
during the period 27 Duly 2015- on

# NONAPPROPRIATED FUND INSTRUMENTALITY
## EMPLOYEE PERFORMANCE RATING
For use of this form, see AR 215-3; the proponent agency is DCS, G1.

1. NAME *(Last, First, MI)*
Carmen Dieppa

| 2a. POSITION TITLE | 2b. POSITION NUMBER | 2c. GRADE |
|---|---|---|
| Child Youth Services Coordinator | NF-1701 | 04 |

2d. I AGREE THAT THE JOB DESCRIPTION ACTUALLY REFLECTS THE DUTIES OF THE POSITION.  SUPERVISOR'S INITIALS DC   EMPLOYEE'S INITIALS

3. NAME AND LOCATION OF EMPLOYING OFFICE

Family and MWR
390 Crane loop suite 100
FORT BUCHANAN, P.R 00934

| 4. TYPE OF RATING | 5. RATING PERIOD | |
|---|---|---|
| [✓] ANNUAL  [ ] PROBATIONARY | FROM *(YYYYMMDD)* 20150701 | TO *(YYYYMMDD)* 20160630 |

6. RETENTION AFTER PROBATIONARY PERIOD

[ ] RECOMMENDED        [ ] NOT RECOMMENDED

7. THE OFFICIAL RATING ASSIGNED

[ ] OUTSTANDING (4)   [✓] SATISFACTORY (2)   [ ] UNSATISFACTORY

[ ] EXCELLENT (3)   [ ] MINIMALLY SATISFACTORY (1)

The lateness of this rating is all on the supervisor and not the approving official or employee

| 8a. SUPERVISOR'S SIGNATURE | 8b. DATE *(YYYYMMDD)* |
|---|---|
| CARTER.DANIEL.J.1261321870 | 20161214 |

| 9a. APPROVING OFFICIAL'S SIGNATURE | 9b. DATE *(YYYYMMDD)* |
|---|---|
| William D Lef | 20161219 |

| 10a. EMPLOYEE'S SIGNATURE | 10b. DATE *(YYYYMMDD)* |
|---|---|
|  | 2017 011 |

*(Employee's signature does not necessarily constitute agreement with the rating, but does acknowledge that position description is accurate and discussion has been held concerning performance with the rating period.)*

DA FORM 3612, NOV 2008        PREVIOUS EDITIONS OBSOLETE.        APD PE v1.01ES

# Carmen Dieppa Evaluation from 20150701 TO 20160630

## Program Administration

### 1a. Met

Justification: Ms. Dieppa supervised her staff, updated SOPs, and ensured that CYS programs were IAW Army Regulations (AR), preferably AR 608-10.

### 1b. Met

Justification: Ms. Dieppa coordinated the MBTI inspection and ensured CYS baseline standards are met within the CYS program. Maintained DOD certification.

### 1c. Met

Justification: Ms. Dieppa monitored the new fee implementation and ensured fees, management controls and space utilization. However, program lost 180 spaces which dropped the CYS program from a level 2 to a level 1 program which lost keys overhead positions in CYS. Losing 180 spaces resulted in a loss of $1.1M of MWR AFP (QCYS) funding.

## Supervision

### 2. Met

Justification: Ms. Dieppa recruited and hired CYS personnel and prepared performance standards within a timely manner. Ms. Dieppa did not conduct to proper references checks on certain hires that have resulted issues within the CYS organization. Furthermore, Ms. Dieppa took appropriate disciplinary actions where behavior needed to be corrected.

## Financial Management

### 3a. Met

Justification: Ms. Dieppa met deadline for NAF/APF budgets and approved purchases of supplies and equipment via the NAF IMPAC card. However, CYS left $390K of unexecuted MWR APF dollars on the table which was given to MDEP QDPC to reimburse Cat A programs.

### 3b. Met

Justification: Ms. Dieppa ensured that Child Youth Management System was correctly utilized. There was an issue with the CYMS database, in FY16 2nd quarter, when the server crashed resulting in untimely DARs and Global Trial Balance was not submitted on time. The problem was fixed in the 2nd quarter. However, there were business months in the 3rd and 4th quarter that DARs and the Global Trial Balance were submitted late.

### Nutrition

4. Met

Justification:  Ms. Dieppa ensured that documentation of meals are in compliance with the United States Drug Administration.  Reports were submitted on time.

### Health

5. Met

Justification:  Ms. Dieppa ensured that health related practices per AR 609-10, Ch 4, Section 4-32 were followed

### Parent Involvement

6a. Met

Justification: Ms. Dieppa maintained the parent involvement program.  She ensured the surveys were conducted.

6b. Ms. Dieppa tracked volunteers and parent involvement on a bi-annual basis

### Quality Control

7. Met

Justification: Ms. Dieppa followed the key control procedure, fixed assets property, and other internal controls operation.

### Equal Employment Opportunity

8. Met

Justification:  Ms. Dieppa adhere to EEO program and provided access to channeling complaints

### CLS/PAR

9. Met

Justification: Ms. Dieppa provide quarterly data for CLS and PAR.  However, the data from CLS/PAR never matched what was in Online Reporting (CYS space reporting database) for all four (4) quarters during the rating cycle

### Customer Service

10. Met

Justification: Ms. Dieppa provided external customer service to patrons. However, the customer service can be improved to colleagues and employees within the Family and MWR organization.

**Local Partnerships**

11. Met

Justification:  Ms. Dieppa maintained communication and partnership with DODEA Schools on Fort Buchanan.  Don't recall any partnerships that are off post.


Overall rating: **Satisfactory**

Justification:  The standards for the 20150701 to 20160630 were weak and recycled material from previous years. Ms. Dieppa has been on the same standards since 2012 which no opportunity to perform to 'outstanding' or 'excellent'.  Reoccurring standards is a result of satisfactory performance. The standards provide very little opportunity to perform to outstanding or excellent performance.  The loss of over $1M in MWR APF (QCYS) in too big of lose to oversee.  There are times were money will be cut, but in this case the money was not cut; it was lost because of in-correct quarterly reporting to the IRO database.

The Youth Sports and School, Knowledge, Inspiration, Exploration, Skills (SKIES) are weak and have been for the past couple of years.  There has been no expansion on both programs.


Dan Carter, Supervisor                                    William Leyh, Senior Rater

Carmen Dieppa, Employee

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **CARMEN QUINTANA-DIEPPA**<br>*Plaintiff,*<br><br>v.<br><br>**DEPARTMENT OF THE ARMY**<br>*Defendant.* | **CIVIL NO. 19-1277** (ADC)<br>• ADEA<br>• TITLE VII<br>• Gender Discrimination<br>• Hostile Work Environment<br>• Race<br>• Retaliation |

To the Honorable Court:

Comes now the Plaintiff represented by the undersigned counsel, and respectfully submit the following **Defense Witnesses Damning Admissions** that impeach defense's arguments for summary judgment and show there are issues of material disputed facts fit for a fact-finding jury:

# **ADEA**

Responsible Management Officials were Under Carmen's PAG

**During 2017, Danial Joseph Carter was under the protected age group (Under 40 Yrs.)**

*Daniel Joseph Carter, Deposition Transcript pg. 9, lines 10-12*

**Supervisor Tod Anthony Scalf knew Dieppa was over age of 40, when he reassigned her**.

*Tod Anthony Scalf, Deposition Transcript pg. 72, lines 3-8*

**Management was aware Carmen Dieppa was a long-term employee.**

*Tod Anthony Scalf, Deposition Transcript pg. 26, lines 12-15*

**Dieppa asked for a promotion for an NF5 Position prior to her involuntary reassignment.**

*Daniel Joseph Carter, Deposition Transcript pg. 52, lines 12-14*

**Daniel Carter denied her a promotion, and William Leyh did not approve her request.**

**Dieppa had *asked* for a promotion for an NF5 Position prior to involuntary reassignment.**

*Daniel Joseph Carter, Deposition Transcript pg. 52, lines 15-25*

*Daniel Joseph Carter, Deposition Transcript pg. 53, lines 2-8*

**From Nov. 2017 thru Jan. 2018, Wendy Winston did NOT substitute Carmen Dieppa.**

*Tod Anthony Scalf, Deposition Transcript pg. 49, lines 20-22*

1

<u>A male under PAG was chosen by Supervisor Tod Anthony Scalf, to substitute Carmen Dieppa.</u>

**Roberto Chico Medina (Under PAG) was interviewed by Tod Scalf to substitute Carmen.**

*Tod Anthony Scalf, Deposition Transcript pg. 50, lines 12-17*

**Supervisor Tod Anthony Scalf admitted that Roberto Chico Medina, *was chosen* by him to replace Carmen, but he declined to accept her position.**

*Tod Anthony Scalf, Deposition Transcript pg. 54, lines 20-25; pg. 55, lines 1-8.*

<u>No prior history of work-related problems with Carmen, she was qualified.</u>

**When Dan Carter became Program Dir (2016), he was not aware of any problem with Dieppa**

*Daniel Joseph Carter, Deposition Transcript pg. 19, lines 14-18*

**Daniel Carter doesn't know of any performance standards issued for Carmen Dieppa.**

*Daniel Joseph Carter, Deposition Transcript pg. 43, lines 10-11*

*Daniel Joseph Carter, Deposition Transcript pg. 48, lines 6-8*

*Tod Anthony Scalf, Deposition Transcript pg. 77, line 11*

**No performance evaluation was given to Dieppa during 2017 prior to reassignment.**

*Tod Anthony Scalf, Deposition Transcript pg. 56, lines 16-19*

**Supervisor Tod Scalf did not give Dieppa written admonishments prior to reassignment.**

*Tod Anthony Scalf, Deposition Transcript pg. 58, lines 9-15*

**Supervisor Scalf never placed Carmen in a personal improvement plan, nor gave her any kind of written reprimand.**

*Tod Anthony Scalf, Deposition Transcript pg. 70, lines 17-22*


# <u>Title VII</u>

**Supervisor Tod Anthony Scalf was aware of Carmen Dieppa was Hispanic.**

*Tod Anthony Scalf, Deposition Transcript pg. 40, lines 2-4*

**Danial Carter doesn't know why Carmen Dieppa was not given required 14 notice prior to reassignment.**

*Daniel Joseph Carter, Deposition Transcript pg. 39, lines 18-22.*

**Dieppa was placed on a leave the same day she was reassigned, November 17, 2017.**

*Daniel Joseph Carter, Deposition Transcript pg. 51 lines 21-24*

**On day of reassignment Supervisor Tod Anthony Scalf told Carmen Dieppa to "go home".**

*Tod Anthony Scalf, Deposition Transcript pg. 62, lines 8-12*

**Roberto Chico Medina (Under PAG) was interviewed by Tod Anthony Scalf to substitute Carmen.**

*Tod Anthony Scalf, Deposition Transcript pg. 50, lines 12-17*

**Supervisor Tod Anthony Scalf admitted that Roberto Chico Medina, was chosen by him to replace Carmen, but he declined to accept her position.**

*Tod Anthony Scalf, Deposition Transcript pg. 54, lines 20-25; pg. 55, lines 1-8.*

**From November 2017 thru January 2018, Wendy Winston did NOT substitute Carmen Dieppa.**

*Tod Anthony Scalf, Deposition Transcript pg. 49, lines 20-22*

**Supervisor Tod Anthony Scalf made *a mistake* in January 2018, when he wrongly believed Carmen Dieppa had exhausted her leave.**

*Tod Anthony Scalf, Deposition Transcript pg. 62, lines 17-25; pg. 63, lines 1-7*

# **Retaliation**

## Management was aware of Carmen's Protected EEO Activity

**At all relevant times Supervisor Tod Anthony Scalf was fully aware of Carmen Dieppa's prior EEOC Charge of discrimination (protected activity).**

*Tod Anthony Scalf, Deposition Transcript pg. 20, lines 9-20*

*Tod Anthony Scalf, Deposition Transcript pg. 76, lines 19-25*

## Retaliation

**Daniel Carter reported to William Leyh, who notified him of an investigation, specifically about Carmen.**

*Daniel Joseph Carter, Deposition Transcript pg. 21, lines 22-25; pg. 22, line 1*

*Tod Scalf also reported to William Leyh.*

*Daniel Joseph Carter, Deposition Transcript pg. 43, lines 15-17*

**William Leyh notified Tod Anthony Scalf of the AR Investigation into Carmen Dieppa.**

*Tod Anthony Scalf, Deposition Transcript pg. 25, lines 2-24*

Tod Anthony Scalf was "told" that the action (reasigment) neded to be executed.

*Tod Anthony Scalf, Deposition Transcript pg. 33, lines 21-25*

3

**Supervisor Tod A. Scalf had a meeting with William Leyh y William Latimer, at some point in July/August 2017 to discuss the AR15 investigation against Carmen Dieppa.**

*Tod Anthony Scalf, Deposition Transcript pg. 82, lines 1-18*


# Pretext

### Pretextual AR Investigation

**When Daniel Carter was interviewed for first AR15 Investigation, it was about Dallas Peterson, not her.**

*Daniel Joseph Carter, Deposition Transcript pg. 25, lines 13-17*

**Daniel Carter was never told why there was a second AR15 Investigation, related to Carmen Dieppa.**

*Daniel Joseph Carter, Deposition Transcript pg. 26, lines 6-11*

**Daniel Carter did not recommend to anyone, that Carmen be reassigned.**

*Daniel Joseph Carter, Deposition Transcript pg. 34, lines 21-25*

**The Second AR15 Investigation did not recommend Carmen's reassignment.**

*Daniel Joseph Carter, Deposition Transcript pg. 33, lines 3-7*

**Supervisor Tod Anthony Scalf can't recall what were the recommendation of Second AR15 report.**

*Tod Anthony Scalf, Deposition Transcript pg. 73, lines 11-14*

# Reassignment decision of Carmen Dieppa had "nothing to do with the AR 15-6" (investigation).

## *Tod Anthony Scalf, Deposition Transcript pg. 66, lines 6-9*

**Supervisor Tod Anthony Scalf was the person who reassigned Carmen Dieppa to newly created position.**

*Tod Anthony Scalf, Deposition Transcript pg. 38, lines 22-25*

*Tod Anthony Scalf, Deposition Transcript pg. 32, lines 19-21*

**Daniel Carter doesn't know the reason nor was told, why Dieppa was to be reassigned.**

*Daniel Joseph Carter, Deposition Transcript pg. 51, lines 17-20*

*Daniel Joseph Carter, Deposition Transcript pg. 55, lines 23-25*

**Daniel Carter "created" a new project management position for Carmen to be reassigned.**

4

*Daniel Joseph Carter, Deposition Transcript pg. 36, lines 22-25*

*Daniel Joseph Carter, Deposition Transcript pg. 37, lines 5-8*

**Note:** The Second AR-15 Investigation which, according to defendant, supposedly led to Carmen Dieppa's removal from her supervisory position: (1) does **not** include reassignment as part of recommendations, and (2) unlawfully recommended Carmen Dieppa "be transitioned into retirement." See Second AR-15 Investigation Report (Interestingly, defendant appear to have failed to include said report as its Exhibit)

RESPECTFULLY SUBMITTED in San Juan, Puerto Rico, 30th. Day of July 2021.

Respectfully submitted,

/S/ Humberto Cobo-Estrella            /S/ Winston Vidal-Gambaro
Humberto Cobo-Estrella, Esq.          Winston Vidal-Gambaro
**USDC-PR230108**                     **USDC-PR 130401**
PO Box 366451                         PO Box 193673
San Juan, Puerto Rico 00936-6451      San Juan, Puerto Rico 00919-3673
Tel. (787) 529-7140                   Tel. (787) 751-286
Email: hcobo@hcounsel.com             Email: wvidal@prtc.net
                                      wvidal.law@qmail.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/S/ Humberto Cobo-Estrella
*Attorney for the Plaintiff*

**Addendum to Appellant's Brief Page 63**

## UNITED STATES DISTRICT
## COURT FOR THE DISTRICT OF
## PUERTO RICO

| | |
|---|---|
| **CARMEN QUINTANA-DIEPPA** *Plaintiff,* v. **DEPARTMENT OF THE ARMY** *Defendant.* | **CIVIL NO. 19-1277 (ADC)** |

## Sworn Statement

I, **Dallas Petersen,** of legal age, and resident of Shawnee, Kansas, under penalty of perjury, pursuant to 28 U.S.C. §1746, state and affirm:

1. My name and personal circumstances are as above stated.

2. That I am fully capable of testifying regarding matters set forth herein.

3. During the time I was Carmen Dieppa's supervisor, these are the things I can testify to:

4. Due to what the army called pervasive issues within the army and Child Care Division throughout the Army. Army Headquarters put an incredible difficult assignment to all Child Care. This included a no fail agenda that demanded perfection in all childcare facilities. And Werther you were in compliance to this agenda was determined by the annual or by-annual inspection would be the measure you use. This includes an inspection by Mr Tindall from baseopps from our headquarters. Mr Tindall is the highest base opps civilian I know and was involved in supervision and rating of the garrison commander. **Carmen always received the highest scores in the Army on these visits.** I contend that the no fail agenda and the fact that the inspections were unannounced meant that at any time numerous people could come and inspect the facility, so must be perfect in execution

1

**Addendum to Appellant's Brief Page 64**

at all times. **This is a monumental task on the Director position and takes an incredibly amount of detailed supervision. This means if Carmen was a monster detailed supervisor the Army created** the scenario for this to happen.

5. ⁀On several occasions she and Mr Leyh at meetings where only the 3 of us were present. Carmen on 3 occasions had to ask **Mr Leyh to stop speaking to her in a disrespectful tone or because of language he used. Such as, "you and your People" or raising his voice to a level of anger During our conversation this attitude was directed at Carmen** but also pervasive when he spoke to me privately about other female employees mostly of Latin lineage. "all most all Ft Buchanan employees share Carmen's linage.

6. During my time I had one complaint brought to my attention from an employee about the way she was spoken to by Carmen. We talked and I made the personal arrangement with this employee for her to come to my office we would discuss any further problems she had. She never returned or made any more complaints.

7. **Mr Leah drank alcohol** at all major functions held at the club and or major functions in the club parking. His **open display of intoxication** was tolerated by Command. **Carmen did not like to interact with Mr Leah when he was in this condition, it showed on her face and Mr Leah recognized that. This I believe lead to or impacted Mr Leah's Opinion of Carmen** in all aspects of her relationship with him.

8. Mr Leah was Carmen's senior rater though the commands of Col Heard and Col Harvey. This links the negative behavior projected onto Carmen from Commander to Commander. So though it's would be speculation to some degree but I believe it connects The real culprit behind the scenes being Mr Leah the Army's high ranking deputy director at Ft Buchanan.

2

I sincerely believe in this correlation, and I doubt Mr Leah's attitude, words, Or harassment towards Carmen changed after I left.

9. ICE **comments were submitted to me and the commander that made very serious accusations without being signed thus un- verifiable. Many were submitted about myself, I refused to comment on the unsigned ones which were always the most outrageous of all.** Command accepted this refusal with approval. But Mr Leah would often see me about Carmen's unsigned comments. They included as my memory allows one about her already verified and credentials and that she often hired relatives and friends. **None of which never panned out as true.** Why would Command demand investigations into unsigned about Carmen but allow other unsigned comments on myself or other directors or chiefs. My opinion it was designed **to harass Carmen.**

10. I can testify about the bogus first AR-15 Investigation and the fabricated allegations against carmen which were mostly bogus, and that investigation was retaliatory for having complained to management about her senior rater's unlawful discriminatory work conduct

Wherefore, I subscribe this statement in Shawnee, Kansas on this 26th day of September 2021.

**Dallas Petersen**
7632 Halsey Street
Apt 305
Shawnee Kansas 66216
7872444151

3